UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-7596
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

VERSUS

SERGIO ORNELAS-RODRIGUEZ,
EDUARDO LOPEZ-GUTIERREZ,
ROGELIO ALEJANDRO GARCIA, and
GERALDO ANTONIO URREGO,
Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____
(January 19, 1994)

Before DUHE, EMILIO M. GARZA, Circuit Judges, and BLACK, District
Judge.[1]

BLACK, District Judge:

Defendants, Sergio Ornelas-Rodriguez ("Ornelas"), Eduardo
Lopez-Gutierrez ("Lopez"), Rogelio Alejandro Garcia ("Garcia") and
Geraldo Antonio Urrego ("Urrego"), were tried jointly before a jury
and convicted of possession with intent to distribute approximately
47 kilograms of cocaine and with conspiracy to possess with intent
to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1),
(b)(1)(A) and 846. All four defendants now appeal their
convictions. We **AFFIRM** the district court in all respects.

_____

[1] Chief Judge of the Southern District of Texas, sitting by
designation.

Cynthia Cruz met co-defendant Urrego at a party on October 31, 1991 and they became romantically involved. Urrego introduced her to co-defendants Garcia and Lopez. Urrego told Cruz he was in the real estate business and asked her to go to Guatemala to pick up some important papers from his brother. She agreed to go and was accompanied by her friend McKinney and her two children. The women were taken to the airport by Urrego and Lopez.

After picking up the papers in Guatemala, Oscar Lopez told Cruz he had purchased a Chevrolet from Urrego that he was unhappy with and asked her to drive it back to Texas. Cruz spoke with Urrego on the telephone and he told her to make the return trip in the automobile. The car was allegedly in need of repair, and Urrego sent Cruz money so this could be done.

The women left for Houston and in Tapachula they were met by Garcia and Ornelas who informed them that they would be following them through Mexico in a red Mustang. All evidence showing Cruz and McKinney had been in Guatemala was taken from them including the papers Cruz was sent to retrieve. When the women arrived in Matamoros they were told to wait one more day before entering the United States. Cruz called Urrego and informed him she was coming home. He accepted her decision.

When Cruz arrived at the Sarita Border Patrol Checkpoint, Agent Guillen asked if he could inspect the trunk. Cruz consented. When Guillen opened the trunk he detected a strong odor of mothballs and glue and noticed that the trunk was not as deep as it

should have been. Cruz was directed to the secondary inspection area where the car was inspected by a canine unit. The dog alerted as it was brought toward the trunk of the vehicle. Guillen then drilled holes into the trunk and a white powder was extracted which tested positive for cocaine. Agents discovered a total of 49 bundles of cocaine in the car.

Cruz and McKinney were interrogated by Guillen in an office overlooking the primary inspection area. Three hours after the women were detained the Mustang arrived at the checkpoint. McKinney began screaming "It's them!" and dove for the floor. The driver was Ornelas and Garcia was his passenger. The vehicle and its occupants were detained at the primary checkpoint. When Ornelas was told to turn off the car and get out he hesitated. Agents believed he was contemplating an escape and physically removed Ornelas from the car. Both men were very nervous.

Agents searched the Mustang and found a tourist entry document for entry into Mexico in the names of Garcia and Ornelas, a page with three phone numbers and two duffle bags. One of the bags contained a set of keys to the Chevrolet driven by Cruz. Ornelas admitted these were his bags but during the interrogation Garcia said the keys belonged to him. On the way to the holding cell Agent McGuire overheard Garcia tell Ornelas that if they had waited one more day (until Thanksgiving) they would not have been caught.

Both Garcia and Ornelas claimed they did not know Cruz or McKinney and that they had come down from Houston to visit family

in San Juan de los Lagos.  When Garcia was shown a photograph of him embracing Cruz he admitted he had met her at a club in Houston and loaned her his car.

Warren, a Corpus Christi police officer assigned to the DEA Task Force, interviewed Cruz.  The conversation digressed and according to Cruz he made sexual advances toward her.  He told her that if she cooperated he would help her and she complied.  Afterwards, Warren told Cruz she had been used by Urrego and that if she did not help them apprehend him the brunt of the offense would fall on her.  Cruz was told to call Urrego and lure him to Corpus Christi.  She called Urrego and told him the car had broken down and he agreed to come and help her.

The DEA arranged for video and audio surveillance at the Marriott Hotel and Cruz was given a "bug".  When Urrego and Lopez arrived at Cruz' room McKinney was allegedly out with the car.  Cruz told them the car had been stopped and searched outside Vera Cruz by Mexican officials and that after the search she said "Pancho" had told her everything.  Lopez got up and suggested they wait for McKinney in the lobby.  As they were leaving the room, three officers emerged from an adjacent room and told the men to stop.  Lopez appeared to reach for his beltline so the officers drew their guns and forced Urrego and Lopez into the elevator.  Lopez, who did not have a weapon, was restrained.  Urrego was hit several times in the head and kicked in the stomach.  His vehicle was seized and the suspects were taken to DEA headquarters.

Urrego, who gave a false name, was interviewed by Agent Irr; however, the interview stopped when Urrego asked for an attorney. Urrego's briefcase was found in his car and it contained telephone records for a Lilia Colmenares of Houston. Several calls from Guatemala and Matamoros were on the statement. Urrego claimed he lived at the Houston address on the Colmenares bill. It was also discovered that the three phone numbers on the paper found in the Mustang all belonged to Urrego.

Agent O'Brien interviewed Lopez who told him he had been staying in a LaQuinta Inn in Houston "waiting for a load" which he thought was a load of cocaine. He knew two women would be bringing it into the country because he had taken them to the airport.

Cruz, McKinney, Ornelas, Garcia, Urrego and Lopez were indicted on December 11, 1991 and charged with possession with intent to distribute approximately 47 kilograms of cocaine and with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A) and 846. Cruz decided to plead guilty and cooperate with the government.[2] Lopez, Ornelas, Garcia and Urrego pled not guilty and all four were convicted by a jury.[3]

---

[2] When Cruz came to Corpus Christi to help the government prepare for trial Agent Warren came to her hotel room and forced her to have sex with him a second time. She had told no one of the first incident but this time the act was done in McKinney's presence. McKinney reported the incident to agent Irr.

[3] After Cruz testified at trial the charges against her and McKinney were dismissed on the government's motion.

The district court sentenced Rodriguez and Garcia to 169 months each. Lopez received a term of 121 months. Their sentences were to be followed by concurrent five-year terms of supervised release. Urrego was sentenced to a 292 month term of confinement to be followed by concurrent 10-year terms of supervised release. Rodriguez, Garcia and Lopez were each ordered to pay a fine of $1000.00 and Urrego's fine was assessed at $25,000.00. All four defendants were ordered to pay the mandatory special assessment of $100.00 each.

II.

All four defendants first raise the claim that the evidence was insufficient to sustain their convictions. In reviewing the sufficiency of the evidence, this Court views all evidence, whether direct or circumstantial, and all inferences drawn from this evidence, in the light most favorable to the verdict. United States v. Madison, 990 F.2d 178, 181 (5th Cir. 1993). The conviction should be affirmed "if the evidence so viewed would permit a rational jury to find all elements of the crime proven beyond a reasonable doubt. . . ." United States v. Roberson, 6 F.3d 1088, 1093 (5th Cir. 1993). "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." United States v. Pruneda-Gonzalez, 953 F.2d 190, 193 (5th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 2952 (1992). The Court must not concentrate on

-6-

"whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  Herrera v. Collins, ___ U.S. ___, 113 S.Ct. 853, 861 (1993).

To prevail in a drug conspiracy prosecution brought pursuant to 21 U.S.C. §§ 841(a)(1) and 846, the government must prove beyond a reasonable doubt that 1) there existed an agreement between two or more individuals to violate the narcotic laws, 2) defendant was aware of the agreement and 3) defendant was a voluntary participant in the agreement.  United States v. Gallo, 927 F.2d 815, 820 (5th Cir. 1991).  All of these elements may be inferred from the "development and collocation of circumstances." United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982).

The jury may rely on presence or association in conjunction with other evidence but mere presence at the scene or a close association with the conspirators, without more, is an insufficient basis for inferring participation.  United States v. Maltos, 985 F.2d 743 (5th Cir. 1992).  Furthermore, placing a defendant in a "climate of activity that reeks of something foul" is not enough to support a conspiracy conviction.  United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982).

In order to convict these defendants of possession with intent to distribute narcotics, the government was required to prove beyond reasonable doubt that a conspiracy existed and that each defendant voluntarily participated therein.  United States v. Rodriquez-Mireles, 896 F.2d 890 (5th Cir. 1990).  "No evidence of

-7-

overt conduct is required." <u>United States v. Hernandez-Palacios</u>, 838 F.2d 1346, 1348 (5th Cir. 1988).

All four defendants contend there was insufficient evidence to support their convictions and believe the government failed to show they were knowingly involved in a conspiracy to possess with intent to distribute cocaine. However, direct evidence of an agreement to deal in drugs rarely exists. "A conspiracy agreement may be tacit, and the trier of fact may infer agreement from circumstantial evidence." <u>Id</u>. An abundance of evidence was presented by the prosecution which established the existence of the conspiracy and the knowledge of the voluntary participation in the conspiracy by all four defendants.

## Urrego

Defendant Urrego asserts the evidence shows only that he caused Cruz to go to Guatemala and that this was done for the sole purpose of obtaining the real estate papers. He purchased round-trip airline tickets for both Cruz and McKinney. The reason the women returned by car was because his friend in Guatemala wanted them to drive the car back. When his co-defendants insisted that Cruz stay an extra day he told her she could come home. He believes that the fact that he used an assumed name when arrested and had the title to the car in his briefcase is inadequate.

Testimony reflects that everyone Cruz met in Guatemala was associated with Urrego and the jury rejected the argument that it was a coincidence that Garcia and Lopez were in Guatemala at the same time. The evidence showed that Urrego was the one the others

contacted whenever a problem arose and he sent money when it was needed. It was Urrego who ultimately convinced Cruz to drive the car back to Texas. Both Ornelas and Garcia had telephone numbers linking them to Urrego. Urrego was unconcerned with the real estate papers Cruz had been sent to retrieve. When he arrived in Corpus Christi his primary concern was the car and whether McKinney would contact the police.

Urrego used an alias on two occasions, once when he tried to send Cruz money and again when he was booked. In addition, the phone numbers in the possession of Garcia and Ornelas in conjunction with the calls from Guatemala and Matamoros tie him to the cocaine.

Resolving all inferences and credibility determinations in favor of the jury's verdict as required by United States v. Santisteban, 833 F.2d 513, 516 (5th Cir. 1987), a rational trier of fact could have found that defendant Urrego voluntarily agreed to and participated in a conspiracy to possess cocaine with the intent to distribute and knowingly possessed cocaine.

### Lopez

Defendant Lopez contends that there is only scant circumstantial evidence against him and that the government relied heavily upon his confession. Whether the confession should have been suppressed is addressed in Section III, infra. He believes that he was not a target of the investigation and that the government did not know of his existence until he appeared at the

hotel in Corpus Christi with Urrego to arrange for the repair of the car.

The circumstantial evidence shows Lopez was associated with some of the other defendants, he went with Urrego when he took Cruz and McKinney to the airport and he repeated the assertion by Cruz that someone "told her everything". Furthermore, a week before his arrest he went to the Department of Transportation to pick up the title to the car driven by a co-defendant at the time of his arrest. The address he gave when the title was issued did not exist.

Lopez believes that since he was not found to be in actual possession of the cocaine his conviction must be reversed. Possession may be constructive if the evidence indicated the defendants ownership, dominion and control over the [narcotic]. United States v. Richardson, 848 F.2d 509, 512 (5th Cir. 1988). In addition, even if the issues of Lopez's constructive possession with intent to distribute were not clearly present, a conspirator is liable for the substantive offenses of his co-conspirators while he is a member of the conspiracy. United States v. Garcia, 917 F.2d 1370, 1377 (5th Cir. 1990) (quoting United States v. Basey, 816 F.2d 980, 997 (5th Cir. 1987).

Although much of the government's evidence regarding the participation by Lopez in the conspiracy may have been circumstantial, it was more than sufficient to support the jury's verdict. See United States v. Martinez, 975 F.2d 159, 162 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1346 (1993).

Therefore, we find there was sufficient evidence to support the jury verdict.

## Garcia

According to defendant Garcia, it was a coincidence that he arrived at the Sarita checkpoint shortly after Cruz and McKinney. He contends he did not know the car driven by Cruz contained cocaine and he was not involved in a conspiracy to bring the drugs across the border.

The testimony shows that Garcia knew Cruz and they had their picture taken together, he owned the car she was driving, was in possession of an extra set of keys to the car and was with her in Tapachula and Matamoros. He also commented to Ornelas that they should have waited another day and the Mustang contained a page of phone numbers linking him to Urrego and Lopez.

Like Lopez, he contends that his conviction must be reversed because he had no actual possession of the cocaine. However, he too had constructive possession because some of his co-defendants had actual or constructive possession and they were his co-conspirators.

The jury refused to accept the premise that all of these events were purely accidental. While each piece of evidence, viewed independently may have been susceptible of innocent interpretation, we are convinced that the jury reasonably could have concluded that when examined in the aggregate, the evidence sufficed to establish Garcia's guilt.

Ornelas

Defendant Ornelas first appears on the scene in Mexico driving the red Mustang. This is the vehicle which contained Urrego's telephone numbers and the keys to the load-vehicle. He, along with Garcia, was responsible for the security of the load. They relieved Cruz and McKinney of all evidence that they had been to Guatemala and controlled the keys to the vehicle. This, together with the fact that he was driving the Mustang, his conduct in Matamoros and his hesitancy to comply with instructions at the checkpoint make it reasonable for the jury to conclude he was involved in the conspiracy. The district court did not err in accepting the jury's verdict.

## III.

Lopez also argues that the district court erred by denying his motion to suppress his confession. He claims that because he was close to Urrego when Urrego was beaten by Officer Warren in the elevator, his later confession at DEA headquarters was coerced and admitted in violation of his due process rights.

When reviewing a ruling from a suppression hearing, "[t]his Court must give credence to the credibility choices and findings of fact of the district court unless clearly erroneous." United States v. Raymer, 876 F.2d 383, 386 (5th Cir.), cert. denied, 493 U.S. 870 (1989) (citing United States v. Watson, 591 F.2d 1058, 1061 (5th Cir.), cert. denied, 441 U.S. 965 (1979)). A finding is clearly erroneous only when the reviewing court is left with the "definite and firm conviction that a mistake has been committed."

_Anderson v. City of Bessemer City_, 470 U.S. 564 (1985) (quoting

_United States v. United States Gypsum Co._, 333 U.S. 364 (1948)).

The ultimate issue of voluntariness, however, is a legal question

requiring the reviewing court to make an independent determination.

_Raymer_, 876 F.2d at 386 (citations omitted).

      The trial court held a four day hearing on pretrial

motions. With respect to the motion to suppress of defendant Lopez

it found:

> It is at this point where the credibility of
> these witnesses is the most important. The
> court does not find that what occurred at the
> time of the arrest was influential in what
> occurred that night later at the DEA when the
> defendant gave his statement. The court
> recalls that the burden of proof placed upon
> the government has been recently established
> and stated in this circuit to be by a
> preponderance of the evidence, which means
> whether or not the government has proven that
> its version of the facts is probably correct,
> not clear and convincing. Were this a clear
> and convincing case, the government's burden
> would not be met. The question is whether or
> not it is probably true that the defendant was
> extended his warnings and knowledgeably and
> voluntarily waived them. And again, in
> viewing that testimony between O'Brien and
> Lopez, the court finds that it is probably
> true that O'Brien is telling the truth and
> Lopez is not. Not only are the motivational
> factors different, the court believes that the
> defendant Lopez convicts his own credibility
> by the exaggeration of his testimony. He was
> not to the court a credible witness. On the
> contrary O'Brien was. He remembered generally
> what happened, he was not sure of other
> things, and that itself brings a certain
> degree of credibility to the court. He
> remembered the most important matters, and
> that is that the defendant was in no
> circumstances of physical distress, no
> circumstances of physically being bound, that
> he was given the warnings, and that there were
> basically two separate events of

interrogation, the second occurring after the defendant was confronted with information that Urrego himself gave during an illegal inquiry. That type of information is the type of information that would inspire a co-defendant to say, according to the government's theory, "The boss has talked, there's no reason for me to be quiet any longer." And the boss had talked. That, to the court is much more credible than a scenario that a DEA officer had threatened to beat, had screamed, had cursed a defendant. It is clearly true the DEA officers and O'Brien included probably pointed out to the defendant the advantages of cooperation. That does not remove free will. The court did not hear circumstances that convinced it that the defendant's free will was jeopardized.

This Court's independent review of the suppression hearing evidence confirms the trial court's findings of fact and must determine what legal conclusions are to be derived from these facts.

The standard for determining whether a confession is voluntary is whether, taking into consideration the "totality of the circumstances," the statement is the product of the accused's "free and rational" choice. Martinez v. Estelle, 612 F.2d 173, 177 (5th Cir. 1980) (quoting Greewald v. Wisconsin, 390 U.S. 519, 521 (1968)). If a person "voluntarily, knowingly and intelligently" waives his constitutional privilege a statement is not considered compelled within the meaning of the Fifth Amendment. United States v. Rogers, 906 F.2d 189, 191 (5th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Not only must the confession be the result of a free and deliberate choice but also made with an awareness of the right being abandoned and the consequences of that decision. Moran v. Burbine, 475 U.S. 412, 421 (1986). A confession does not occur in a vacuum but is a response to a

particular fact scenario.  <u>United States v. McCrary</u>, 643 F.2d 323, 329 (5th Cir. Unit B 1981).  Therefore, the issue of whether a confession was voluntary must be reviewed on a case-by-case basis. <u>Jurek v. Estelle</u>, 623 F.2d 929, 937 (5th Cir. 1980)(en banc), <u>cert. denied</u>, 450 U.S. 1001 (1981).

The admission of the Lopez confession turns upon a credibility choice.  The district court's decision to choose the credibility of O'Brien was not clearly erroneous.  It believed O'Brien when he said Lopez had been told Urrego had talked and that there were advantages to cooperating.  The confession took place several hours after the incident in the elevator and there is absolutely no evidence that Lopez was personally threatened with physical violence if he failed to confess.  As a result we affirm the district court's denial of the suppression motion.

IV.

Garcia contends his Sixth Amendment right of cross examination was violated when Officer Warren invoked the Fifth Amendment after being called to testify by Defendant Urrego.  Cruz had entered into a plea agreement and testified against Urrego, Lopez, Garcia and Ornelas.  During cross-examination she alleged sexual misconduct during her incarceration at the Sarita Checkpoint by Officer Warren.  Warren was faced with criminal charges stemming from this incident.  As a result, Warren was called as a witness by the defense to test the credibility of Cruz he invoked the Fifth Amendment.  The defense then moved for a mistrial and a hearing was held outside the presence of the jury.  The motion was denied.

-15-

Garcia argues that the Sixth Amendment includes the right of cross-examination of a witness as well as the right of confrontation. United States v. Wilschner, 624 F.2d 840 (8th Cir.), cert. denied, 449 U.S. 994 (1980). He contends Cruz was a questionable witness and Warren's invocation of the Fifth Amendment added more weight to the government's case because the jury was forced to rely on the testimony of a dubious witness.

The court must make two inquires when determining whether reversible error occurred as a result of a witness' invocation of his Fifth Amendment rights. First, error may occur due to prosecutorial misconduct if the government makes a flagrant attempt to build its case on inferences arising from the assertion of the privilege. United States v. Victor, 973 F.2d 975, 979 (1st Cir. 1992). Second, error may occur if the refusal to answer adds considerable weight to the government's case. Id. Garcia relies on United States v. Quinn, 543 F.2d 640, 650 (8th Cir. 1976) which deals with a government witness asserting the Fifth Amendment.

In the case at hand, Warren was not a government witness. Therefore, neither the court nor the government violated Garcia's right to cross-exam Warren. We decline to extend existing case law to include rebuttal witnesses called by the defense. Since Garcia's right to cross-examination was not violated by either the government nor the court we find the district court did not err when it refused to grant Garcia's motion for a mistrial.

V.

Urrego asserts that during voir dire, which occurred on April 13, 1992, the court made a comment that could allegedly be construed as improperly characterizing the burden of proof required for a conviction which resulted in a denial due process.

The record shows that the court stressed during its preliminary instructions to the jury that the burden of proof is always on the government. However, the Court also made the following comment which forms the basis of Urrego's complaint:

> Today is a great week for the exercise of all sorts of duties of citizenship, especially for you. You have jury service on Monday, you can vote on Tuesday, and you can pay your income taxes on Wednesday, and you can go to church on Friday and Sunday of Easter Holy Week and pray that you made all the right decisions and pray that you properly accounted for your taxes.

Defense counsel expressed concern with this statement and discussed the matter with the Court. The Court agreed with counsel that the comment was inappropriate.

When the case went to the jury on April 22, 1992, the jurors were given detailed instructions on the presumption of innocence and the burden of proof. It is presumed jurors follow their instructions. United States v. Villarreal, 963 F.2d 725, 729 (5th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 353 (1992)(citing Richardson v. Marsh, 481 U.S. 200, 206 (1987)).

Defendant contends this statement affected the jury's consideration of the burden of proof because although the jurors were given a proper instruction concerning proof beyond a

reasonable doubt, the invitation to pray set a different standard. Urrego argues that this standard is based on the individual jurors' concept of God and whatever expectations must be satisfied within that context. An invitation to pray implies that the person in authority in the courtroom believes there is a standard of judgment outside the courtroom and outside the standard that is to be applied by them according to the law.

The Court has carefully reviewed the record on this issue. Eleven days passed from the time the preliminary statement was made and the case went to the jury. Any error which may have occurred as a result of this casual remark was cured by the passage of time and the district court's detailed instruction on the presumption of innocence and the burden of proof. There is no evidence that the statement in question deprived Urrego of a fair trial.

VI.

Finally, Urrego contends he was denied his right to due process because the district court denied his motion to dismiss based on outrageous government conduct. Urrego claims that after Officer Warren had sex with Cruz during her interrogation he told her that she had to contact Urrego because if the government could not get anything on him the majority of the blame would fall on her. Cruz called Urrego twice from the DEA office. Urrego agreed to wire her $200 and meet her at the Marriott Hotel in Corpus Christi. When Urrego arrived, Cruz was instructed by the DEA to get him to talk about the drugs in the car. She was unsuccessful.

Defendant argues that this Court should invoke its supervisory powers and set aside the district court's order denying the motion to dismiss.

The underlying purpose of these inherent supervisory powers are to 1) implement a remedy for a violation of a recognized right, 2) to preserve judicial integrity by insuring that the conviction rests on appropriate consideration validly before the jury and 3) as a remedy designed to deter further illegal conduct. United States v. Hasting, 461 U.S. 499 (1983). Urrego contends Warren took advantage of his position and abused the authority intrusted to him. He believes that moments after the first sexual act Warren set in motion activities which caused Urrego to travel to Corpus Christi where he was arrested. Urrego argues that the harm increased when the government used Cruz, the most detrimental witness against him, as a witness when it had knowledge of the misconduct.

"Reversals of convictions under the court's supervisory power must be approached "with some caution." United States v. Payner, 447 U.S. 727, 734 (1980). In addition, "[s]upervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." Hasting, 461 U.S. at 506.

Cruz testified that she would have assisted the government without the sex and there is no evidence that either the government or the Court sanctioned Officer Warren's conduct. An

-19-

official investigation was initiated to determine if criminal charges were warranted and the Court chastised the DEA for allowing the situation to occur. Furthermore, the evidence used against Urrego was independent of the sexual activity. It included the materials taken from his brief case, telephone records and toll receipts. This Court concludes that this is not a case where it is necessary for it to exercise its supervisory powers.

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.