UNITED STATES of America

v.

Terrance D. GLASPIE.

Crim. No. 97–20098–01.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Jan. 25, 1998.

Thelma Abel, Lake Charles, LA, Pro se.

Robert E Patrick, Lake Charles, LA, Pro se.

David C. Willard, Michael C. Piccione, Sr, Piccione & Neumann, Lafayette, LA, for Terrance D Glaspie.

Perry Ray Sanders, Jr, Sanders, Crochet & Chism, Lake Charles, LA, for Kelly N. Abel.

Larry J. Regan, U.S. Atty's Office, Lafayette, LA, for U.S.

### RULING

MELANÇON, District Judge.

Defendant's Motion to Suppress Evidence was referred to United States Magistrate Judge Mildred E. Methvin for her Findings and Recommendation. After an independent review of the record and objections filed, this Court concludes that the Findings and Recommendation of the magistrate judge are correct and this Court adopts the conclusions set forth therein.

Accordingly, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that defendant's Motion to Suppress Evidence is DENIED.

### FINDINGS AND RECOMMENDATION

METHVIN, United States Magistrate Judge.

Before the court is defendant's Motion to Suppress Evidence filed November 17, 1997 (Rec.Doc. 39). The motion was referred to me for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

On December 9, 1997, a lengthy evidentiary hearing was held on the motion to suppress. A second hearing was conducted on December 19, 1997. After a review of the facts and the applicable law, I recommend that defendant's motion to suppress be **DENIED.**

### Summary of Issues and Findings

Defendant and his girlfriend, Kelly N. Abel, were arrested on August 1, 1997 after Lake Charles City Police officers found cocaine in Abel's car and purse, on defendant's person, and in a house shared by the two.

The instant federal indictment was returned on October 14, 1997, charging defendant and Abel with one count of possession with intent to distribute over 400 grams of crack cocaine. The court dismissed the charge against Abel without prejudice on November 19, 1997, on the government's motion (Rec.Doc. 44).

Defendant seeks to suppress four items of evidence: (1) a bag containing 45 grams of crack cocaine found in Abel's car; (2) a bag of cocaine found in Abel's purse; (3) cocaine, marijuana, and a bag of cash found in the house which Abel and Glaspie shared; and (4) incriminating oral and written statements made by defendant following his arrest.[1]

Defendant argues that Items 1, 2 and 3 are the product of unlawful searches and seizures under the Fourth Amendment. Defendant's motion is meritless as to these items. Defendant has no standing to object to the searches of Abel's car and purse (Items 1 and 2). Even if he did, the searches were lawful. The search of the house which resulted in the seizure of Item 3 was pursuant to a valid search warrant.

Defendant argues that his statements (Item 4) were involuntary and the product of promises and misleading statements made by FBI Agent Don Dixon. The evidence established that extensive confession bargaining occurred between Agent Dixon and defendant. I did not find either the defendant or Agent Dixon fully credible with respect to

---

1. The search of Abel's purse took place inside the house shared by defendant and Abel, and was done with Abel's consent prior to issuance of the search warrant on the house. It is unclear whether defendant seeks suppression of the cocaine found in the purse or only the cocaine and other evidence found in the house later after issuance of the search warrant. Both issues will be addressed.

It should be noted that defendant did not move to suppress a bag of cocaine which officers saw defendant throw away just prior to defendant's arrest outside his house, and later recovered. While defense counsel spent much time at the evidentiary hearing questioning Glaspie about events surrounding his arrest (Tr.I, pp. 164–170), defendant has never moved to suppress the tossed cocaine. Therefore, this issue will not be addressed.

the nature of the discussions. Nonetheless, considering the totality of the circumstances, I conclude that the negotiations did not render defendant's statements involuntary.

## FINDINGS OF FACT

### Background

Two sets of events are pertinent to the motion to suppress: (1) those occurring on the night of August 1, 1997, when defendant and Abel were arrested; and (2) later discussions between defendant, Abel, and the FBI during which the FBI allegedly made false promises in return for defendant's incriminating statements.

### Night of August 1, 1997

On August 1, 1997, Lake Charles Police Officer Gary Geheb responded to a complaint about a large group of males loitering at the Circle A store in Lake Charles.[2] Officer Geheb instructed the males to leave the store.[3] When Officer Geheb returned a short time later, the same group of males had again gathered at the store. Officer Geheb saw defendant inside the store and a black Nissan which defendant normally drove in the parking lot. Defendant was a suspected drug dealer whom Geheb had been investigating. Officer Geheb knew the car belonged to the defendant's girlfriend, Kelly Abel.[4] Officer Geheb went in the store and tried to converse with defendant. The defendant would not make eye contact and seemed quite nervous. When asked how he arrived at the store, the defendant responded that he had walked to the store. The officer believed this to be a lie, because he had never seen the defendant walking and the Nissan which he normally drove was in the lot. Defendant left the store on foot.

Officer Geheb called for backup and waited to see who would come for the Nissan. While waiting, Officer Geheb noticed a set of keys on the store counter and asked the clerk who they belonged to. The clerk nervously replied that he had been told to say that they were his car keys. At this point, the officer believed there were drugs in the car based on all of the circumstances involved.

Eventually another man (later identified as Alan Anderson) entered the store, retrieved the keys, and drove the Nissan away. (Tr.I, p. 21). Officer Geheb made a "traffic stop" because the car's window tint appeared to be illegal. Anderson exited the vehicle, stated he did not know who owned the car, and refused Officer Geheb's request to search the vehicle (Tr.I, p. 22–23). Officer Geheb then instructed the driver to roll down the window slightly so he could attach a tint meter. When the driver opened the car door, the officer observed a baggie containing crack cocaine in plain view in the driver's side door panel (Tr.I, p. 24). Officer Geheb arrested Anderson and brought him to the station for questioning. Anderson then admitted that defendant had told him there were drugs in the car and offered him ten dollars to move it.

Following Anderson's arrest and statement, Officer Geheb asked narcotics Detective Gary Sonnier for help in arresting defendant. (Tr.I, p. 41). Detective Sonnier and another officer went to the house in which defendant was known to reside with Abel—both to arrest the defendant, and to obtain a description of the house for search warrant. As they approached, the officers saw defendant leave the rear of the house and proceed along a sidewalk. (Tr.I, pp. 44, 60). Defendant began running when he saw the officers, and Detective Sonnier saw him reach into his pocket as he ran. Defendant was arrested shortly thereafter and a 1–2 oz. bag of crack cocaine was retrieved from the path where defendant had run (Tr.I, p. 45).

Detective Sonnier then went to the defendant's residence with the purpose of obtaining Abel's consent to search, or to secure the

---

2. Transcript of first Motion to Suppress Hearing, hereinafter "Tr.I", at p. 17.

3. *Id.*

4. Tr.I, p. 21. Another officer, Gary Sonnier, testified that he had never seen defendant in the Nissan, but rather that he drove a Lincoln (Tr.I, p. 55). However, the evidence is undisputed that defendant and Abel had only met in May 1997, and that defendant was seen driving Abel's black Nissan after that point.

house until a search warrant could be obtained. Abel answered the door and allowed Sonnier into the house, but was evasive in response to questioning (Tr.I, pp. 47–48). Abel stated that the house was not in her name or in Glaspie's, and that she and defendant just stayed there (Government's Ex. No. 1, Affidavit in support of the search warrant). Detective Sonnier did not ask Abel to sign a voluntary search form in light of this response. Instead, he advised Abel that she would be brought down to the police station for questioning until he could obtain a search warrant to search the house. Sonnier asked Abel if she needed to take her purse, which was in plain sight on the couch just two to three feet away (Tr.I, p. 49). Abel looked at the purse and stated that she did not know where her purse was. Abel began walking around. Detective Sonnier pointed out the black purse on the couch and Abel then picked it up. When asked, Abel responded that she did not have any weapons or drugs in her purse. The officer then asked for permission to search her purse. Abel consented and opened up the purse stating that she had her bra and panties in there. When she opened up the purse, Detective Sonnier saw a large zip-loc bag containing about twenty large pieces of crack cocaine (Gov.Ex. 1, Affidavit). Abel was arrested and taken from the house. A search warrant was obtained and a later search of the house revealed more cocaine, marijuana, and a large sum of cash.

### Incriminating Statements

There is no dispute that Glaspie engaged in a number of deal-making conversations with FBI agents in the days following his arrest. As a result, Glaspie made a number of incriminating statements which are the subject of this motion to suppress. Glaspie contends:

On or about August 1, 1997 in Lake Charles, Calcasieu Parish, Louisiana, F.B.I. agents Don Dixon and Kevin Hicks interrogated the Defendant, TERRANCE D. GLASPIE, and cohered the Defendant into involuntarily statements (sic) against interested (sic) by promising not to arrest and jail his girlfriend, Kelly N. Able, and by promising that by making such statements he would not received (sic) a jail sentencing (sic) in excess of five (5) year (sic), in violation of law. At the time of the set (sic) interrogation, the Defendant was not properly advised of his right to counsel and to the best of his knowledge, did not sign a waiver of counsel prior to making the inculpatory statements against interest. Said inculpatory statements against interest were both oral and written.

(Defendant's Motion to Suppress, Rec. Doc. 39, ¶ 3).[5]

The facts are in dispute. It is clear that sometime during the night of the arrests, Detective Sonnier requested assistance from FBI Agent Don Dixon because of a purported shortage of local law enforcement officers. Another motivation seems clear: Glaspie had an extensive criminal drug history, and Detective Sonnier knew that federal agents would probably be interested in seeing Glaspie prosecuted under the tougher federal drug laws. At the time of his arrest on August 1, 1997, Glaspie had four prior felony drug convictions and was on parole from a 1990 Texas conviction for possession with intent to distribute crack cocaine.[6] He was also on probation from a 1988 Louisiana conviction on two counts of distribution of marijuana. Both Texas and Louisiana had issued warrants for violations of parole and probation, respectively.[7] Glaspie also had at least eleven charges pending against him in Calca-

---

5. Unfortunately, Glaspie failed to mention this issue in either of his memoranda in support of the motion. Defendant thus provides no legal support for his allegations, although there is much written on the subject. Although the government addressed the issue in two of its three briefs (Rec. Docs. 72 and 76), its research is limited to one case (Rec.Doc.72, p. 13). Thus, the task of the court is doubly difficult: the court must not only resolve the factual disputes regarding the actual nature of the negotiations, but must also navigate the legal complexities of this issue without the benefit of proper briefs from the parties. Time does not permit it in this case, but in the future, the parties will be required to supplement their briefs.

6. See Pretrial Services Report dated September 8, 1997, provided to this court in connection with Glaspie's bond proceedings, p. 3.

7. Id.

sieu Parish, including possession of marijuana, third offense, attempted first degree murder, four additional counts of illegal drug possession, and possession of a firearm by a convicted felon.[8]

After receiving Officer Sonnier's call on the night of August 1, Agent Dixon proceeded to the Lake Charles Police Department. He attempted to interview defendant, but Glaspie refused to talk (Tr.I, p. 84). Two days later, on a Sunday evening, Abel called Agent Dixon at home and said that the defendant wanted to speak with Dixon. She urged Dixon to go talk to the defendant at the jail (Tr.I, pp. 84–85).

The following day, Agent Dixon along with FBI Agents Kevin Hicks and Hall Jones met with the defendant (Tr.I, p 85). The agents told the defendant that they did not want him to make any statements about the charges; that they were not going to advise him of his rights; and that they were only meeting with him at the request of his girlfriend (Tr.I, p. 86).

Agent Dixon testified that defendant wanted to know what was going to happen to him (Tr.I, p. 104). Dixon told the defendant that there was a possibility that federal charges would be filed and that "there was a real problem with him" because the defendant was currently on probation, had prior convictions and had eleven pending state charges against him, he could serve a substantial period of time in jail (Tr.I, p. 86–87). Dixon testified that he listed the various federal charges which could be brought against defendant, including a cocaine conspiracy charge under 21 U.S.C. § 846 which carries a ten-year-to life sentence; a charge of possession with intent to distribute, which would carry a sentence of from five to forty years depending upon the amount of cocaine involved; and an "ITAR" count for each time the government could prove defendant crossed the state line to engage in narcotics trafficking. "ITAR" refers to a charge of Interstate Transportation in Aid of Racketeering under 18 U.S.C. § 1952. The record is silent as to how Glaspie responded to this

information, or what other conversation took place on August 4. In any event, no incriminating statements resulted from this meeting.

Abel again contacted Agent Dixon on Saturday, August 9, while Dixon was playing golf. According to Dixon, Abel said that defendant "had thought over what I talked about and that he wanted to cooperate, wanted to change his life around and wanted me to go talk to him." (Tr.I, p. 88).

The following Monday, August 11, FBI Agents Dixon, Hicks, and Jones met with the defendant. Defendant was read his Miranda rights and signed a written waiver form (Gov.Ex. 2, p. 2). Agent Dixon gave defendant a written statement signed by himself and two other FBI agents certifying that the local district attorney had agreed to dismiss "all outstanding local charges" if defendant "pleas (sic) guilty to one count Federal Possession of crack cocaine with intent" (Gov.Ex. 2, p. 3; Tr.I, p. 91). As a result of discussions and negotiations on this date, defendant made the oral and written incriminating statements which are the subject of the instant motion to suppress (See Gov.Ex.2, pp. 3 and 5–6).

Agent Dixon denied making any promises to defendant, and particularly denied promising defendant that he would get five years or less if he confessed (Tr.I, p. 97–98, 106). He testified that it is his practice not to promise defendants any particular sentence. (Tr.I, p. 99). Dixon stated that it was the defendant's idea to have the FBI contact the local D.A. and obtain an agreement to dismiss the pending state charges if defendant pled to a federal count (Tr.I, p. 100). (Defendant admitted this in his testimony, Tr.I, p. 179–180). According to Dixon, it was also defendant's idea that Abel not be prosecuted if he cooperated.

Defendant and Abel both testified that Agent Dixon explicitly promised that if defendant signed a statement regarding his involvement with the cocaine found on August 1, defendant would serve a sentence of

---

**8.** Tr.I, p. 87. The Pretrial Services Report actually lists twenty pending charges in Calcasieu Parish.

five years or less and Abel would remain free (Tr. I, p. 138 (Abel), 173–174 (Glaspie)). Defendant testified that he had never heard of "ITAR" before (see p. 8 *supra* ), but that Agent Dixon explained that if he cooperated, he could possibly plead to an ITAR count and serve zero to 30 months if his cooperation were truthful and substantial. (Tr.I, p. 173, 175).

I found neither defendant nor Agent Dixon to be fully credible witnesses. Defendant's testimony, although consistent, was somewhat exaggerated and self-serving. For instance, three times he claimed that agents took advantage of him because he was "ignorant of the law" (Tr.I, pp. 171, 173, 176). He testified that he did not request a lawyer on the night of August 1 when the FBI Agents first attempted to speak with him because he was "ignorant to the law right then and there." (Tr.I, p. 171). The record clearly shows, however, that defendant is quite experienced in criminal law, having been convicted of felonies on four previous occasions. No doubt defendant knows the Miranda warnings by heart.

Agent Dixon, on the other hand, was somewhat evasive. While categorically denying that any threats or promises were made, Agent Dixon skillfully avoided shedding any light on what he actually said to Glaspie and Abel. There is no dispute that Agent Dixon spoke to both Glaspie and Abel on a number of occasions, both by telephone and in person, and that the topic of these conversations was how they could benefit from cooperating with the government. Agent Dixon provided little if any information, however, regarding what words he actually used in prompting defendant to cooperate. While Agent Dixon testified to what he did **not** say, it is impossible to determine what he **did** say from his own testimony. On cross examination, for instance, Agent Dixon's responses were abbreviated, often monosyllabic.

Q   Okay. all right. Were any more promises made during that meeting? Did you make any promises about this case on August 4th?

A No.

Q   To him?

A No.

Q   What was the purpose of your meeting, debriefing?

A   He called me. I went to see him. What do you want, Terrance.

Q   Well, what did he want?

A Wanted to talk to me.

Q   About?

A About this case.

Q   Cooperation?

A Wanted to know what was going to happen to him.

Q   What did you tell him?

A Don't know.

Q   Was he cooperating at that time?

A No.

Q   Did he ever agree to cooperate?

A Later.

Q   In fact, did he cooperate?

A He did.

(Tr.I, pp. 103–104). Agent Dixon appeared bored and irritated. His testimony was not forthright or candid, and I concluded that his wholesale denials that he used promises or inducements to gain defendant's cooperation were not fully credible.

Abel also testified concerning the negotiations at issue. Abel, as noted above, is defendant's girlfriend and former co-defendant. Her testimony was consistent with defendant's regarding promises made by Agent Dixon that if they cooperated, defendant would serve five years or less, and Abel would not be prosecuted (Tr.I, p. 138). Abel testified that Agent Dixon gave her his pager number (Tr. I, p. 139). She contacted Dixon and asked him to visit defendant in jail. She testified that Agent Dixon consistently told her and defendant that although the sentence range for possession with intent to distribute was five to 40 years, defendant would serve less than five years if he cooperated. Abel testified that she made notes contemporaneously with these discussions, and that "I have every answer that [Dixon] ever told me written down." (Tr.I, p. 151–152).

Because Abel did not bring her notes to the first evidentiary hearing, a second hear-

ing was held on December 19, 1997. Abel testified from a copy, but the original notes were filed into the record following the hearing (Defendant's Ex. B). The first page of the notes contains the following notations:

IN ORDER

#1 SIGN PAPER, ALL STATE CHARGES INCLUD TEXAS

#2 FED DROP TO POSESS 4–5—IF CO–OP

#3 ITOR—WITH CO–OP

#4 OFF PROB IN 93 IN L C ← IS THAT A CHARGE

#5 NO FURTHER INHANCE-HANCES (sic)

Abel testified that these were notes made from a conversation with Agent Dixon, and that the notes reflect specific promises for her to convey from Agent Dixon to defendant (Tr.II, p. 5–7, 21). She was used as a go-between (Tr. II, p. 6). Her understanding of #2 above was that the federal charges would be dropped to possession, and would involve a possible sentence of four to five years (Tr.II, p. 21). Abel testified that when Dixon mentioned "ITOR" (sic), she asked what this was and that Dixon responded that "Terrance will know what I'm speaking of" (Tr.II, p. 7).

On page four of the notes (Def.Ex.B), a rectangular box appears with the notation "5–40" inside. Outside and to the right of the rectangle is the notation, "IF CO OP LESS →". Abel testified that this notation was from another conversation in which Agent Dixon promised that defendant would serve less than five years if he cooperated (Tr.II, p. 22).

I found Abel to be a more credible witness than either defendant or Agent Dixon. No doubt she has interests at stake here. The defendant is her boyfriend. Abel has already shown that she is loyal to Glaspie and has tried to help him with the instant criminal charges by working undercover with various law enforcement agents (Tr.I, p. 140).

Defendant has bragged to a recent cellmate that Abel will "do whatever it takes" to help him (Tr. II, p. 46).[9] On the other hand, Abel testified at her own risk. Although the federal charges against her are currently dismissed, the dismissal was without prejudice. She could be re-charged at any time AUSA Regan insisted upon warning Abel of the penalties of perjury, but Abel maintained that everything she stated in court was the truth (Tr.II, p. 19). I found Abel's testimony to be forthright, specific, and more importantly, supported by written notes. There has been no challenge to the authenticity of the notes.

Considering the foregoing, I conclude that FBI Agent Don Dixon, defendant, and Abel engaged in a series of bargaining discussions regarding what defendant and Abel could gain in return for their cooperation. Defendant initiated at least two meetings with the FBI agents. In the course of these discussions, Agent Dixon did the following: (1) made representations that the sentencing range for possession with intent to distribute cocaine was 5 to 40 years; (2) led Glaspie and Abel to believe—without making any concrete promises—that a sentence of less than five years might be possible with substantial cooperation; (3) indicated that Glaspie might be charged with an "ITAR" count carrying less then five years if the defendant and Abel substantially cooperated; (4) gave defendant, as requested by him, a written statement signed by himself and two other FBI agents certifying that the local district attorney had agreed to dismiss "all outstanding local charges" if defendant "pleas (sic) guilty to one count Federal Possession of crack cocaine with intent;" and (5) discussed the possibility of all charges being dismissed against Abel if defendant cooperated.

The record shows that after the FBI obtained the incriminating statements from Glaspie, AUSA Regan drew up a plea bargain and Bill of Information and sent it to Glaspie's then-attorney. The Bill charged defendant with one count of possession with

---

**9.** This witness, Carmichael Green, credibly testified that Glaspie told him he was going to call Abel and let her know what questions to expect at the evidentiary hearing, and that Glaspie said Abel would do whatever it took to help him.

Green admitted, however, that he never actually heard any conversation between Glaspie and Abel. I cannot conclude, therefore, that Abel's testimony should be disregarded on the basis of Green's testimony.

intent to distribute 45 grams of cocaine. The maximum penalty as shown in the plea documents includes a prison term of not less than ten years and not more than life (Defendant's Exhibit C, p. 3). Because the prison term differed from what defendant believed he had bargained for, he rejected it. Defendant now seeks to suppress his inculpatory statements as involuntarily made.

## LEGAL ANALYSIS

### (1) *Defendant's Challenge of the Car Search*

#### (a) Standing

The defendant argues that the "window tint" stop was a pretext and constituted an unlawful search of a vehicle in violation of the Fourth Amendment. The Government asserts that even if it was a pretext stop, the defendant lacks standing to object.

■ There is no dispute that the car belonged to Abel, that neither Abel nor the defendant were present at the time of the stop. A defendant has standing to challenge the admission of evidence only if his own constitutional rights have been violated. *United States v. Salvucci*, 448 U.S. 83, 86–87, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

■ In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that a passenger lacks standing to challenge the legality of a search of the vehicle in which they were riding. In that case, the denial of the passenger's motion to suppress was upheld. "[W]ithout a proprietary or other similar interest in an automobile, a mere passenger therein lacks standing to challenge the legality of the search of the vehicle." *Id.* at 131. Fourth Amendment rights are personal rights which may not be vicariously asserted. *Id.* at 134. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* (quoting *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)).

■ The Fifth Circuit recognizes the two-pronged test established by the Supreme Court for determining whether a defendant has standing to bring a Fourth Amendment challenge to an allegedly illegal search. *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir.1996). The inquiry depends on: (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized; and, (2) whether that expectation of privacy is one which society would recognize as objectively reasonable. *Riazco*, 91 F.3d at 754.

■ Generally, a passenger without a possessory interest in an automobile lacks standing to complain of its search because his privacy expectation is not infringed. *See United States v. Roberson, Jr.*, 6 F.3d 1088, 1091 (5th Cir.1993), *cert. denied*, 510 U.S. 1204, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994). *See also United States v. Mendoza–Burciaga*, 981 F.2d 192 (5th Cir.1992), *cert. denied*, 510 U.S. 936, 114 S.Ct. 356, 126 L.Ed.2d 320 (1993) (only the driver has standing to challenge the search; the passenger in the truck has no standing to challenge the search); *United States v. Cardona*, 955 F.2d 976, 981 (5th Cir.), *cert. denied*, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992) (the non-owner/passenger of a car had no standing to challenge search of the vehicle which was registered to a third party); *United States v. Harrison*, 918 F.2d 469, 472 (5th Cir.1990) (the passenger did not have standing to contest search of the truck).

■ In *Riazco*, the Fifth Circuit reasoned that the driver of the car lacked standing because he did not assert a property or possessory interest in the rental car. *Riazco*, 91 F.3d at 754. The driver neither owned nor rented the vehicle and did not have the renter's permission to drive it. *Id.* A defendant's standing is determined by his possessory interest in the vehicle in question and how reasonable his professed privacy expectation was.

■ In this case, defendant was not present at the time the black Nissan was stopped. In fact, Officer Geheb testified that the defendant went to great efforts to distance

himself from the vehicle. Defendant told Officer Geheb that he was on foot and was not driving any vehicle (Tr.I, p. 19, 32). Further, the Officer knew that the vehicle belonged to Abel, not Glaspie (Tr.I, p. 18, 21). While the officer also stated that he had previously observed the defendant driving the vehicle, the defendant was not driving it at the time of traffic stop. The car was being operated by a third party (Tr.I, p. 22). Thus, the defendant made no showing here that he had a legitimate expectation of privacy in the vehicle's door panel from which incriminating evidence (crack cocaine) could be readily viewed by the officer. The defendant cannot therefore complain that his Fourth Amendment rights were violated.

■ As the proponent of a motion to suppress, the defendant bears the burden of establishing that the search and seizure infringed on *his* Fourth Amendment rights. *United States v. Greer*, 939 F.2d 1076, 1092 (5th Cir.1991), *cert. denied*, 507 U.S. 962, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993) (citing *Rakas*, 439 U.S. at 130–131 n. 1). I find that the defendant has not sufficiently carried his burden. I conclude that defendant lacks standing to raise a Fourth Amendment challenge of the search of the vehicle and seizure of its contents.

**(b) Pretext**

■ Even if the defendant had standing to argue pretext, under the facts established and the applicable law, suppression is not warranted. Pretext stops are not *per se* improper. The constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved. *Whren v. United States*, 517 U.S. 806, 808, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). A traffic stop is considered reasonable where police have probable cause to believe that a traffic violation has occurred. *Id.* If probable cause exists, then it does not matter if the officer believes drugs may also be found in the car. *Id.*

■ Here, Officer Geheb testified that he had observed the small black Nissan on two prior occasions while en route to other calls and noticed the dark tinting on the windows (Tr.I, p. 33). The officer stated that he was waiting for an opportunity to stop and ticket the driver of this vehicle for violation of the window tint law (*Id.*). He also noted that the police department had only received the window tint meters several months prior to the traffic stop (Tr.I, p. 34). Officer Geheb stated that he stopped the Nissan on August 1, 1997 based on his observation of its window tint and a measurement was taken (Tr.I, p. 33, 37). Thus, I find the stop was constitutionally valid and was based on the officer's probable cause to believe that a violation of the window tint law had occurred.

**(2) *Defendant's Challenge of the Purse Search:***

■ To the extent that defendant seeks to suppress the cocaine found in Abel's purse on August 1, 1997, the motion is meritless. First, defendant lacks standing to challenge the constitutionality of the search as he did not own or have a proprietary interest in the purse. Second, there is no dispute that Abel gave consent to search the purse, and that the search was therefore lawful. Thus, under the law recited above, I find that any expectation by the defendant that the contents of his girlfriend's purse would not be subject to search and seizure under the circumstances set forth herein and after Abel consented to the search, is unreasonable. Simply, the defendant's constitutional rights were not violated as a result of the officer's search of Abel's purse.

**(3) *Defendant's Argument that the Initial Terry Stop was Illegal:***

■ Defendant argues that all of the challenged evidence (drugs, money and statements) should be suppressed as "fruits of the poisonous tree" following Officer Geheb's allegedly illegal *Terry* stop of the defendant on August 1, 1997. This argument is without merit.

Under *Terry v. Ohio*, 392 U.S. 1, 22–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. The permissibility of such an investigatory stop is determined by balancing

the intrusion on the individual's Fourth Amendment rights against the officer's need to search or seize. *Id.* at 21. Under this approach, such an intrusion is justified if the police officer can point to "specific and articulable facts" which, taken together with rational inferences from those facts, warrant the intrusion. *Id.*

Defendant testified that Officer Geheb stopped him as he was leaving the Circle A store on the night of August 1, 1997 and asked him to open his mouth and pull down his pants so Officer Geheb could perform a body cavity search in the parking lot (Tr.I, p. 163). This testimony was in direct conflict with that of Officer Geheb, who testified that he allowed defendant to leave the store after their initial conversation. I found Officer Geheb's testimony to be credible, and conclude that no *Terry* stop—much less a body cavity search—occurred. Thus, no Fourth Amendment rights were implicated at the Circle A.

Officer Geheb testified that when he noticed the defendant in the convenience store, he acknowledged him and asked him how he was doing (Tr.I, p. 18). The officer also noted that he knew the defendant and "had dealings with Terrance before, and usually we talk" (*Id.*). Officer Geheb also asked the defendant how he got to the store and the defendant responded that he had walked (Tr.I, p. 18–19). The officer then walked outside with the defendant, stood beside the black Nissan car and asked him again how he got to the store (Tr.I, p. 19). The defendant again informed him that he had walked and then the defendant left (*Id.*). Officer Geheb explicitly denied placing the defendant against a wall and frisking him or touching him and denied seizing anything from the defendant during this encounter (*Id.*).

Nevertheless, even if the officer's encounter with the defendant constituted an investigatory stop under *Terry*, the officer sufficiently articulated specific facts to justify such a stop. Officer Geheb observed the black Nissan in the store parking lot and knew of its potential involvement in drug trafficking; he saw the defendant in the store behaving nervously and refusing to acknowledge him; and, twice before Officer

Geheb had warned a large gathering of known drug dealers to disburse. These facts clearly justify any intrusion that the defendant may have suffered as a result of Officer Geheb's brief questioning.

██ Finally, even if Officer Geheb had conducted a search of defendant outside the Circle A, which I conclude he did not, it is undisputed that no drugs were found on defendant's person at the Circle A. Defendant's argument that the cocaine found later that night should be suppressed as "fruits of the poisonous tree" because of the alleged illegal *Terry* search outside the Circle A is meritless. Defendant provides no support for this conclusion.

## (4) The Voluntariness of Defendant's Statements

██ Before a defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *United States v. Restrepo,* 994 F.2d 173, 183 (5th Cir.1993). An inculpatory statement is voluntary if it is the product of the accused's "free and rational" choice. *United States v. Ornelas–Rodriguez,* 12 F.3d 1339, 1347 (5th Cir.1994), *cert. denied* 512 U.S. 1222, 114 S.Ct. 2713, 129 L.Ed.2d 839 (1994) (*quoting Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968)). The test is whether, considering the "totality of the circumstances," the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963).

██ A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897). Although the rule is broadly stated, it has not been applied to

invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel. The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances. *Hutto*, 429 U.S. at 30; *Miller v. Fenton*, 796 F.2d 598, 608 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

A number of cases have held promises and inducements by law enforcement agents to be insufficiently coercive to constitute a Fifth Amendment violation. *See*, e.g., *U.S. v. Baldacchino*, 762 F.2d 170, 178–79 (1st Cir.1985)(confession voluntary despite promise to bring defendant's cooperation to the attention of DEA when defendant signed valid waiver after receiving Miranda warnings and no signs of coercion were present); *U.S. v. Ruggles*, 70 F.3d 262, 265–66 (2d Cir.1995) (confession voluntary despite promise of leniency if defendant cooperated with law enforcement officers); *U.S. v. Ornelas–Rodriguez*, 12 F.3d 1339, 1347 (5th Cir.) (confession voluntary even though officers explained to defendant advantages of cooperation), *cert. denied*, 512 U.S. 1222, 114 S.Ct. 2713, 129 L.Ed.2d 839 (1994); *U.S. v. Harris*, 914 F.2d 927, 933 (7th Cir.1990) (confession voluntary even though police solicited the confession by offering to reduce charges); *U.S. v. Willard*, 919 F.2d 606, 608 (9th Cir.1990) (confession voluntary even though defendant told that police would recommend leniency and cooperation would be made known to the U.S. Attorney), *cert. denied*, 502 U.S. 872, 112 S.Ct. 208, 116 L.Ed.2d 167 (1991); *U.S. v. Fountain*, 776 F.2d 878, 884–86 (10th Cir.1985) (confession voluntary despite arguable grant of immunity by agent when well-educated defendant repeatedly attempted to make deal and was advised three times that only U.S. Attorney's office could grant immunity, and no signs of coercion).

█ The Supreme Court instructs that "both the characteristics of the accused and the details of the interrogation" should be considered in determining voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Factors which the courts have considered in determining the totality of the circumstances include (1) the location of the questioning; (2) whether Miranda warnings were given; (3) whether the accused initiated contact with law enforcement officials; (4) the accused's personal characteristics such as youth, intelligence, drug problems, psychological problems, physical condition, and experience with the criminal justice system; (5) length of detention; (6) whether the questioning was repeated or prolonged; and (7) whether physical punishment was used such as the deprivation of food or sleep. *See Schneckloth*, 412 U.S. at 225–26, 93 S.Ct. at 2046–47 (citations omitted); GEORGETOWN LAW JOURNAL "Criminal Procedure Project," Vol .85, April 1997, pp. 965–967.

█ Applying these factors to the instant case, I conclude that the FBI tactics used here, though undesirable and distasteful, did not overbear Glaspie's will such that his statements are involuntary. Glaspie initiated the discussions with the FBI, and in fact, listed the requirements for his cooperation, including a demand that the pending 11 state charges be dropped and that charges not be brought against Abel. Glaspie was an active and informed participant in the bargaining process.

Though Glaspie was lead to believe he would be offered a plea bargain involving a sentence of five years or less, I do not find that any unequivocal promise to this effect was made. Furthermore, Glaspie is 27 years old, has a GED, and is an experienced criminal defendant. He has been convicted of felonies on four previous occasions. He is familiar with the plea bargain procedure. There is no testimony that Glaspie thought he was engaged in a plea bargain with the FBI agent.

Actual plea discussions did not occur until after Glaspie had made the inculpatory statements. During the time Glaspie was negotiating with FBI Agent Dixon: "(1) no specific plea offer was made; (2) no deadline to plead was imposed; (3) no offer to drop specific charges was made; (4) no discussion of sentencing guidelines for the purpose of negotiating a plea occurred—only a generalized discussion to give the suspect an accurate appraisal of his situation occurred; and (5)

no defense attorney was retained to assist in the formal plea bargaining process." *United States v. Morgan,* 91 F.3d 1193, 1196 (8th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850.

■ Glaspie's discussions with the FBI agent were not plea negotiations, but rather "confession bargaining." *See United States v. Robertson,* 582 F.2d 1356, 1368 (5th Cir. 1978). As such, they are not barred from admission by Rule 11(e)(6) FED.R.CR.P. which applies only to plea bargains with an attorney for the government.

A fact situation similar to the one at hand was presented in *United States v. Watson,* 591 F.2d 1058 (5th Cir.1979). Watson was arrested on state armed robbery charges. Shortly after his arrest, an FBI agent visited him at the police station. Upon learning that Watson was afraid of being prosecuted in state court, the FBI Agent summoned the District Attorney, who then told Watson that if he cooperated with the FBI, the state charges would be dropped. Watson ultimately confessed, and his confession was used to convict him on federal bank robbery charges. On appeal, Watson claimed that his confession was involuntary, and that it was also admitted in violation of Rule 11(e)(6) FED.R.CR.P. These claims were rejected. The Fifth Circuit found that the circumstances surrounding the confession indicated that it was made voluntarily. The court also found that Rule 11(e)(6) was not violated by admission of the confession because the negotiations with the FBI agent constituted "confession bargaining" rather than plea bargaining. *Id.* at 1061.

While *Watson* did not involve a purported "broken" bargain as here (the state charges against Watson were dropped as agreed), I conclude that this factor is not controlling. Again, there is no clear evidence that an unequivocal promise was made to induce defendant to make the inculpatory statements. Furthermore, there is no evidence of physical coercion, threats, or other factors which would have overborne Glaspie's free will. The questioning was conducted in a cooperative manner. Miranda warnings were given. Glaspie had received Miranda warnings on numerous other occasions. Considering the foregoing factors, I conclude that defendant's inculpatory statements were made voluntarily.

### CONCLUSION

For the foregoing reasons, I recommend that the defendant's Motion to Suppress Evidence be **DENIED.**

The parties have been notified by previous order that **any objections to this Report and Recommendation must be filed in writing on or before January 13, 1998.** Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation by January 13, 1998 shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana on January 7, 1998.