**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kurt Douglas RAYMER,
Defendant–Appellant.**

**No. 88–4402.**

United States Court of Appeals,
Fifth Circuit.

June 20, 1989.

John M. Colette, Jackson, Miss., (court-appointed), for defendant-appellant.

Ruth R. Harris, Asst. U.S. Atty., George Phillips, U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before WISDOM, KING and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Kurt Raymer appeals his conviction for threatening a probation officer. He asserts three major claims: (1) that his confession was involuntary, (2) that the

government improperly elicited evidence from his psychologist, and (3) that the statute creating the offense (18 U.S.C. § 115) does not apply to a retired official. We affirm.

## FACTS

In late 1986 and 1987 appellant Kurt Raymer was serving a sentence for robbery in the Kentucky State Penitentiary in Eddyville, Kentucky. Several years earlier, he had been on probation in Mississippi for a previous conviction under the Federal Youth Corrections Act (YCA). Raymer believed that his YCA conviction had been set aside but was nevertheless being used improperly to enhance his Kentucky sentence. Raymer filed a motion to vacate, set aside or correct his sentence, and the government responded with an affidavit from the Mississippi Probation Office stating that Raymer's YCA conviction had not been set aside. Raymer's probation officer was not on duty the day the affidavit was sent, so it was signed by U.S. Probation Officer Gene Loper.

Raymer received a copy of this affidavit while confined in the Kentucky prison. On December 1, 1986, Raymer wrote a threatening message on the bottom of a copy of the affidavit, and mailed it to Loper. Raymer also enclosed a "poem" that contained more threatening language (hereafter "Letter 1"). This letter/poem was the basis of count I of the indictment.

On January 29, 1987, Raymer sent a threatening letter to Mrs. Sue Thompson, a court clerk whose name evidently appeared on some papers in Raymer's possession. This letter stated that Mrs. Thompson was "marked to die," and went on to say that a "pardner" of Raymer's would "take care of you and Mr. Gene Loper my parole officer in Jackson, but if he don't I promise you I will." ("Letter 2"). This letter was the basis of count II. Another letter to Mr. Loper, which was the basis of count IV, stated that "when I get out this time I'm killing you," and then went on to threaten to torture and kill Mr. Loper's family should Loper die before Raymer was released ("Letter 4").[1]

On March 17, 1987, an FBI agent and Kentucky correctional officer interviewed Raymer while he was confined in the Kentucky prison hospital. Raymer was hospitalized because he had lacerated himself and ingested some wire two weeks before the interview. The agent warned Raymer of his *Miranda* rights by reading from the FBI "Advice of Rights" form. Raymer waived his rights by signing the form, and confessed to writing the letters. Raymer acknowledged each letter as his by signing the agent's photocopy of each of the first three letters a second time at the March interview. His confession was reduced to a written statement by the FBI agent, which he signed.

Raymer was indicted on four counts of violating 18 U.S.C. § 115. The indictment charged him with threatening to kill Gene Loper in retaliation for official actions Loper had performed.[2] On the motion of Raymer's counsel, the court ordered a psychiatric evaluation to determine Raymer's competence to stand trial. After that initial psychiatric evaluation, the court found Raymer incompetent and ordered him committed for hospitalization and treatment in December, 1987. Later an evaluation at another facility on April 7, 1988, found

---

1. An additional letter, dated January 29, was the basis for count III of Raymer's indictment. The trial court granted Raymer's motion for acquittal on this count, concluding that the evidence was not sufficient to establish that Raymer threatened to kill Mr. Loper, as was charged in the indictment, because the letter only stated that Raymer would beat Loper so badly that he would beg for mercy. Raymer's acquittal on count III is not at issue on appeal.

2. 18 U.S.C. § 115 makes it a crime to threaten "to assault, kidnap, or murder ... an official whose killing would be a crime under [18 U.S.C. § 1114] with intent to impede, intimidate, interfere with, or retaliate against such official, ... while engaged in or on account of the performance of official duties...." 18 U.S.C. § 115 (Supp. V 1987).

18 U.S.C. § 1114 provides for punishment for anyone who kills "... any United States probation or pretrial services officer ... engaged in or on account of the performance of his official duties,...." 18 U.S.C. § 1114 (Supp. V 1987).

Raymer competent to stand trial. The court then held a competency hearing on May 19, 1988, and also found the defendant competent to stand trial.

Raymer was convicted by a jury on counts 1, 2, and 4 of the indictment. Pursuant to 18 U.S.C. § 4244, the court determined that Raymer suffered from a mental disease or defect, and committed him to treatment in lieu of imprisonment. The court's order constituted a provisional sentence of imprisonment for the maximum term authorized by the statute, which was 5 years for each incident, a total of 15 years.

## I. Validity of Confession

■■■ Raymer contends that his waiver of *Miranda* rights and subsequent confession, which was admitted into evidence at trial, were not voluntary. The lower court conducted a pretrial suppression hearing and concluded that the waiver and confession were voluntary. The government bears the burden of proving by a preponderance of the evidence that both the waiver of *Miranda* rights and the confession were voluntary. *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972); *United States v. Terrazas–Carrasco,* 861 F.2d 93, 95 (5th Cir. 1988). This Court must give credence to the credibility choices and findings of fact of the district court unless clearly erroneous. *United States v. Watson,* 591 F.2d 1058, 1061 (5th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979). The ultimate issue of voluntariness is a legal issue, however, which requires the appellate court to make an independent determination. *Wicker v. McCotter,* 783 F.2d 487, 498 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *United States v. Kreczmer,* 636 F.2d 108, 110 (5th Cir. Unit B Feb. 1981); *Jurek v. Estelle,* 623 F.2d 929, 932 (5th Cir.1980) (en banc), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

Raymer relies primarily on his mental condition to argue that his waiver of rights and his confession were not the product of his "free and rational choice." *Martinez v. Estelle,* 612 F.2d 173, 177 (5th Cir.1980). He also suggests that under the "totality of circumstances" his waiver was not voluntary, considering factors such as his prescription drug intake, the prison hospital environment, his painful condition, and his limited education.

Raymer's argument that his mental illness and the circumstances surrounding his hospitalization render his *Miranda* waiver and confession involuntary is foreclosed by *Colorado v. Connelly, supra.* The Court in *Connelly* determined that the unsolicited confession and subsequent waiver of *Miranda* rights by an individual who claimed that he was under the compulsion of the "voice of God" were not involuntary. The court concluded that "notions of 'free will'" have no place in assessing the voluntariness of a confession or *Miranda* waiver. *Connelly,* 479 U.S. at 169, 107 S.Ct. at 523. Instead, the voluntariness of the waiver or confession depends "on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Id.* at 170, 107 S.Ct. at 523.

*Connelly* mandated a shift in the analysis of the voluntariness of a *Miranda* waiver. *See* Dix, *Federal Constitutional Confession Law: The 1986 and 1987 Supreme Court Terms,* 67 Tex.L.Rev. 231, 288–91 (1988). The relevant test no longer focuses on the defendant's free will, as it has in the past. *See Henry v. Dees,* 658 F.2d 406, 409 (5th Cir. Unit A Oct. 1981); *Jurek v. Estelle,* 623 F.2d at 937. Instead, the focus is on the presence or absence of police coercion. *Connelly,* 479 U.S. at 167–70, 107 S.Ct. at 522–524; *Penry v. Lynaugh,* 832 F.2d 915, 918 (5th Cir.1987), *cert. granted,* — U.S. —, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988); *Bell v. Lynaugh,* 828 F.2d 1085, 1092 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987).

■■■ A defendant's mental condition still properly figures into the voluntariness calculus. Police exploitation of the mental condition of a suspect, using "subtle forms

of psychological persuasion," could render a confession involuntary. *Connelly*, 479 U.S. at 164–65, 107 S.Ct. at 520–21. *See also Blackburn v. Alabama*, 361 U.S. 199, 206–08, 80 S.Ct. 274, 279–81, 4 L.Ed.2d 242 (1960). Thus, while we still examine the totality of the circumstances to determine voluntariness, "that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary under constitutional law." *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir.1988), *cert. denied,* —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988).

There is no evidence which suggests police coercion in obtaining Raymer's confession and waiver. The testimony of his doctor and social worker indicated that he was not under the influence of any medication on the day of his confession. Raymer was read his rights aloud, and then he reviewed and signed the F.B.I. waiver form. Raymer also testified at the suppression hearing that he was aware of his constitutional rights at the interview because of his previous experience with the court system. The agent who obtained the confession testified that Raymer "admitted right off" that he had written the letters, so questioning was not extensive. At one point, Raymer requested and was allowed to leave the interview area, but he returned thirty minutes later. Raymer was in the interview room and subject to questioning for a total of 42 minutes. In short, in the absence of any further evidence of government coercion, we hold that both Raymer's confession and waiver of his rights were voluntary.

## II. *Question Attempting to Elicit Incriminating Evidence from Psychologist*

Raymer also contends that the court erred in overruling his objection and refusing his request for a mistrial when the government attempted to elicit an incriminating statement Raymer had made from one of Raymer's court appointed psychologists. Pursuant to Raymer's motion *in limine,* the government had been directed by the court not to ask any questions of any psychiatrist or psychologist, without prior permission of the court, regarding incriminating statements Raymer may have made. This instruction was allegedly violated, and Raymer objected.

The exchange in question took place during the government's cross examination of Raymer's sole defense witness, Dr. Dawn Baraldi, who testified in favor of Raymer's insanity defense.

Q (By Government's Attorney): Do you recall the portion of that report where the psychologist stated in the report that Mr. Raymer had stated that he was somewhat upset because it took him "four tries" in order to have the federal authorities indict him and remove him from the Kentucky State prison system?

A: Yes I recall that—

Q: Now do you recall the portion of the report that it says it appears that his actions were based on logical decision-making and were not the result of any serious mental illness?

At that point the defense objected to this line of questioning and asked for a mistrial. A bench conference ensued. The court overruled the objection and refused to grant a mistrial.

Prior to the trial, the defense had moved for a psychiatric examination to determine Raymer's competency under 18 U.S.C. § 4241. That motion was granted, and Dr. Baraldi's testimony concerning Raymer's sanity dealt with the two competency examinations to which he was submitted. Raymer argues that under *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), use of a competency examination by the prosecution for purposes of proving Raymer's guilt violates his Fifth Amendment right against self-incrimination. The government responds that under *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) the findings of *Smith* are limited, because the Court held that the government may use the psychiatric evaluation for purposes of disputing Raymer's insanity claim. Contrary to the defense's claim, many of the circumstances of the present case are closer to those of *Buchanan* than

to those of *Smith.* In *Buchanan,* the defense moved for the examination, the entire defense was based on mental status, and the defendant did not take the stand. *Buchanan,* 483 U.S. at 423–24, 107 S.Ct. at 2918. All these facts parallel those of our case.

*Buchanan* does differ from Raymer's case however on one critical point. In the report of the competency exam in *Buchanan* the psychiatrist "set forth his general observation about the mental state of the petitioner but had not described *any* statements by petitioner dealing with the crimes for which he was charged." *Id.* (emphasis in original). In the case at hand the report clearly made reference to Raymer's statements that he wrote the threatening letters in order to have federal authorities remove him from the Kentucky prison. The government claims that it asked questions regarding this area of the report not to prove Raymer's guilt but rather his sanity. The government contends that his threats were a deliberate and rational attempt to get out of the Kentucky prison system and into the federal system.

██ There are two alternative grounds for holding that overruling the objection to the question was not reversible error. The first is invited error. The second is that, assuming it was error, it was so minor as to be harmless. First, the subject of Raymer's motive was only brought up by the government after the defense, during direct examination, had asked Dr. Baraldi about the defendant's discussion of letters he wrote to persons "as a result of his YCA conviction." The relevant questioning by the defense was as follows:

Q: (By Raymer's Attorney): Did Mr. Raymer talk to you about his problems back in December or early 1987?

A: He talked with me about his problems and he related some of them to his time in prison in Kentucky. I cannot be specific as to what dates he was talking about.

Q: Okay. Do you recall him talking about his YCA conviction?

A: Yes I do.

Q: *And do you recall him talking about some letters that he wrote to different people as a result of that YCA conviction?*

A: I recall him talking about being angry towards these people and having some issues with them yes.

(emphasis added). Raymer's statement to the psychologists regarding letters he had written was thus revealed for the first time on *direct* examination of Dr. Baraldi, who was the defendant's own and sole witness.

The doctrine of invited error applies to this situation; when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such "invited error." *United States v. Lemaire,* 712 F.2d 944, 948–49 (5th Cir.), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 535, 78 L.Ed.2d 716 (1983). *See also, United States v. Archer,* 733 F.2d 354, 361 (5th Cir.), *cert. denied,* 469 U.S. 861, 105 S.Ct. 196, 83 L.Ed.2d 128 (1984) *and* 469 U.S. 862, 105 S.Ct. 198, 83 L.Ed.2d 130 (1984); *United States v. Taylor,* 508 F.2d 761, 763–64 (5th Cir.1975).

"A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby." *United States v. Lewis,* 524 F.2d 991, 992 (5th Cir.1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1673, 48 L.Ed.2d 180 (1976). The prosecutor's reference to Raymer's statements concerning the letters he had written only briefly touched on a matter the defense had already raised. Furthermore, it is hard to see how Raymer was prejudiced, particularly since the witness did not completely answer the question and the government did not mention the matter again. If there was any error in not sustaining the defense's objection to the question, it is not a ground for reversal because of the "invited error" doctrine.

██ Second, even if we assume that the government's question began to delve into inadmissible subject matter, any error in allowing the government's very brief question, unanswered, was harmless. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct.

824, 17 L.Ed.2d 705 (1967), the Supreme Court rejected the notion that errors even of constitutional dimension necessarily require reversal of criminal convictions. *Id.* at 21–22, 87 S.Ct. at 827. Since *Chapman,* the court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

Raymer essentially claims that his *Miranda* rights against self-incrimination were violated because his incriminating statements made to a psychologist during a competency examination were used against him although he was not made aware that that could be the case. The short answer is that the effect on the trial of this brief exchange constituted a minor technical error at best. The general question was only partially answered. The follow-up question by the prosecution, which elicited the objection, was dropped without answer. This brief exchange in no substantial way cast doubt upon the psychologist's testimony and diagnosis or incriminated Raymer by proving a responsible mental capacity. Added to this minor matter must be the fact that the evidence of Raymer's guilt is overwhelming. *Harryman v. Estelle,* 616 F.2d 870, 875–77 (5th Cir.) (en banc), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980).

We conclude that the defense invited the critical question on direct examination, but that in any event, the brief questioning episode was so minor that even if there was technical error it was harmless.

III. *Threat to a Retired Public Official*

■ Raymer appeals the court's refusal to dismiss counts II and IV of the indictment, 685 F.Supp. 1358, arguing that those counts do not come under the ambit of 18 U.S.C. § 115 because Loper retired on December 30, 1986. The record reflects that letter 2 was sent on January 29 or 30, 1987, and letter 4 was sent on February 4, 1987. The relevant part of 18 U.S.C. § 115 states that:

> Whoever ... threatens to ... murder ... an official whose killing would be a crime under such section [18 U.S.C. § 1114] with intent to impede, intimidate, interfere with, or retaliate against such official, judge, or law enforcement officer while engaged in or on account of the performance of official duties, shall be punished as provided in subsection (b).

18 U.S.C. § 115 (Supp. V 1987).[3]

18 U.S.C. § 1114 includes "any United States probation or pretrial services officer" under the rubric of its protection. Neither § 115 nor § 1114 mentions the status of retired officers, and thus Raymer argues that the statutes do not cover his 1987 threats. This is an issue of first impression. 18 U.S.C. § 115 is a relatively new statute, and the few cases in which it has been the basis of a prosecution have not addressed whether retired officials are covered.[4] Furthermore, no recorded cases decided under 18 U.S.C. § 1114 (a statute with a longer judicial history than § 115) have addressed the issue of whether retired federal officials fall under its penumbra.

"When interpreting statutes and regulations, the plain language of the statute or regulation controls our construction, absent a clearly expressed legislative intention to the contrary." *Oliver v. United States Postal Service,* 696 F.2d 1129, 1131 (5th Cir.1983). *See also American Tobac-*

---

**3.** 18 U.S.C. § 115 has been subsequently amended and the new statutory language is slightly different. *See* 18 U.S.C.A. § 115 (West Supp. 1989). We apply the statute in force at the time of Raymer's crimes, December 1, 1986 through February 4, 1987. The subsequent amendment occurred on November 18, 1988.

**4.** Excluding Raymer's case, § 115 appears to have been employed only three times. *See Unit-*

*ed States v. Hohman,* 825 F.2d 1363 (9th Cir. 1987); *United States v. Gray,* 809 F.2d 579 (9th Cir.), *vacated,* —— U.S. ——, 108 S.Ct. 54, 98 L.Ed.2d 18 (1987), *on remand,* 833 F.2d 148 (9th Cir.1987); *United States v. Guez,* No. 88 CR. 355, 1988 WL 112889 (S.D.N.Y. October 18, 1988) (LEXIS U.S.Dist. file 11721). None of these cases provide any assistance in resolving the issue before us here.

*co Company v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). The legislative history of § 115 indicates that the statute was originally intended only to protect the members of the families of United States officials, and the statutory language clearly reflected this limited purpose. Public Law No. 98–473, 1984 U.S. Code Cong. & Admin.News 3182, 3496–97. In 1986 the law was amended. Pub.L. 99–646, §§ 37(a), 60, Nov. 10, 1986, 100 Stat. 3599, 3613. The legislative history of the amendment states "Section 43 of the Bill amends 18 U.S.C. 115(a) which extends protection to family members of certain federal officials to the officials themselves." Pub.L. No. 99–646, 1986 U.S.Code Cong. & Admin.News 6139, 6153. The legislative history is therefore inconclusive on the issue of whether § 115 was meant to cover retired officials as well as officials currently employed.

We are left with the plain language of the statute. That language prohibits threats against an official "with intent to ... retaliate against such official ... on account of the performance of official duties." These words would clearly cover an official not only while he was in the performance of his duties but also against retaliation after his duties were completed. An off-duty official who was threatened or assaulted in retaliation for previous performance of his duties would be covered under the plain language of the statute. It is also reasonable, therefore, to conclude that a retired official subject to retaliation because of previous performance of duties is in the same position as an official who is currently employed by the government but is off-duty. Neither one need be currently performing his duties when experiencing retaliation. The only difference between the two is that the former is in a sense permanently off-duty. Hence it would be illogical not to extend the protection of the statute to the retired official.

It is noteworthy that § 115(a)(2), as amended in 1988, refers to "any person who formerly served as a person designat-

ed in paragraph (1)," whereas § 115(a)(1)(B) does not.

> Whoever assaults, kidnaps, or murders, or attempts to kidnap or murder a member of the immediate family of *any person who formerly served as a person designated in paragraph* (1), with intent to retaliate against such person on account of the performance of official duties during the term of service of such person, shall be punished as provided in subsection (b).

18 U.S.C.A. § 115(a)(2) (West Supp.1989) (emphasis added).[5] Congress by this amendment obviously wished to make clear that a former official's family was covered by § 115. This amendment is strong support for our interpretation that the applicable version of the statute included in its coverage death threats to retired officials for their official acts. Congress felt it necessary to make clear that families of retired officials were protected. We can conclude that it felt no need to state separately in the amendment that retired officials themselves were protected because Congress felt that they already were covered under the statute. The alternate interpretation would compel the irrational conclusion that Congress was concerned about protecting the families of retired officials but had no concern at all about protecting the retired officials themselves.

Raymer argues that the "rule of lenity," which calls for strict construction of criminal statutes when they are ambiguous, precludes our interpretation. There are several restrictions, however, on the use of the rule of lenity. It only comes in at the end of the process of interpretation of a statute, *Russello v. United States,* 464 U.S. 16, 29, 104 S.Ct. 296, 303–04, 78 L.Ed.2d 17 (1983); it is only "an aid for resolving an ambiguity; it is not used to beget one," *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961); and it is not applied when it would conflict with "the implied or expressed intent of Congress," *Liparota v. United States,* 471

---

**5.** As noted *supra,* the current statute does not apply to our case, because the amendment was enacted after Raymer's crime and trial. How-

ever, taking note of it is useful in our attempt to interpret the words of the applicable statute.

U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985). In sum, the rule of lenity is not "an inexorable command to override common sense and evident statutory purpose.... Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers." *United States v. Brown,* 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948). *See also United States v. Levy,* 579 F.2d 1332, 1337 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1979).

After reviewing all other information from which aid can be derived, we do not find § 115 to be ambiguous. The wording of the statute reveals its obvious purpose, to free public officials from retaliation for their official acts. The threat of retaliation remains just as inhibiting to proper official acts even after that official retires as it is during his or her active tenure. The rule of lenity is only to be employed when a court after "seiz[ing] every thing from which aid can be derived ... [is] left with an ambiguous statute." *United States v. Noe,* 634 F.2d 860, 862 (5th Cir. Unit B), *cert. denied,* 454 U.S. 876, 102 S.Ct. 355, 70 L.Ed.2d 186 (1981), *quoting United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). Because we find that Congress in § 115 intended to protect officials against threats incurred on account of the performance of official duties, regardless of whether such officials were retired at the time at which they received the threats, there is no justification for applying the rule of lenity.

### IV. *Other Issues*

■ Raymer also contends that the government's proof was not sufficient to convict him because the government failed to establish that Loper had received or even seen letters 2 or 4. Some of the letters were apparently addressed incorrectly and both 2 and 4 were turned over to the FBI before reaching Loper. Raymer also notes that Loper testified that he did not feel *immediately* threatened because he knew that Raymer was in confinement. These arguments fail because actual re-

ceipt and subjective impression of the recipient are not elements of the crime under 18 U.S.C. § 115. *Cf. United States v. Walker,* 835 F.2d 983, 987 (2d Cir.1987) (In prosecution for violation of 18 U.S.C. § 111, subjective testimony as to victim's state of mind is not necessary if reasonable person would have feared imminent bodily harm.). In addition, under the analogous statute 18 U.S.C. § 876, which prohibits the mailing of threatening communications, this Court has found it sufficient for the government to prove that the defendant wrote a letter containing a threat and knowingly caused it to be mailed. *United States v. DeShazo,* 565 F.2d 893, 894 (5th Cir.), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978).

■ Raymer finally contends that the government failed to prove that each letter contained a threat *to murder* Loper, as the indictment charged. He prevailed in the court below with this argument as to letter 3. On appeal, Raymer notes that letter 1 contained a disclaimer that "this letter is not a threat in any way." The same letter went on, however, to state that Raymer would "see [Loper] some day," and to describe how the blood would flow from Loper's body before they laid him in his grave. Raymer also points out that letter 2 was the threat to kill Mrs. Thompson, and only contained a collateral threat that Raymer or his partner would also "take care" of Loper.

Whether the letter contained a threat to murder is an issue of fact for the jury. "If a reasonable recipient, familiar with the contents of the communication, would interpret it as threat, the issue should go to a jury." *Martin v. United States,* 691 F.2d 1235, 1240 (8th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983). A review of the letters establishes without doubt the letters presented a sufficient issue of fact to go to the jury.

### *Conclusion*

We conclude that Raymer's waiver and confession were voluntary, the government's unpursued question to Raymer's

psychologist did not justify a mistrial, and that Raymer's motions for acquittal and dismissal were properly denied.

AFFIRMED.