IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 98-11390

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ABDUL HALIM BEKAR,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Northern District of Texas, Lubbock
5:96-CR-041-05

———————————

July 10, 2000

Before KING, Chief Judge, and GARWOOD and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:[*]

A jury in federal district court convicted defendant-appellant

Abdul Halim Bekar (Bekar) of conspiracy to import heroin into the United

States, as well as conspiracy to possess with intent to distribute and

to distribute.  On appeal, Bekar challenges the sufficiency of the

evidence supporting his conviction for conspiracy to import; he also

challenges the district court's decisions to allow the testimony of two

---

[*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that this
opinion should not be published and is not precedent except under the
limited circumstances set forth in 5TH CIR. R. 47.5.4.

British law enforcement officers and to admit in evidence business records, as well as testimony about those records, from a British travel agency that Bekar had allegedly used to launder drug money. Finding sufficient evidence to support Bekar's conviction for conspiracy to import and no reversible error in the district court's evidentiary rulings, we affirm.

## Facts and Proceedings Below

Bekar is a citizen of Great Britain. He was arrested in London by officers of H.M. Customs and Excise National Investigation Service (British Customs) on July 8, 1996, and was later extradited to the United States.[1] On August 13, 1996, a grand jury in the Northern District of Texas, Lubbock Division, returned a five-count superseding indictment against Bekar and several other co-defendants. The indictment charged Bekar with one count of conspiracy to import more than one kilogram of heroin, in violation of 21 U.S.C. § 963, and one count of conspiracy to possess more than one kilogram of heroin with intent to distribute and to distribute, in violation of 21 U.S.C. § 846. The indictment alleged that Bekar facilitated an international heroin conspiracy by coordinating the receipt and concealment of the twenty-four kilograms of heroin in a restaurant in New York City, and later arranging for the heroin's retrieval by other co-conspirators.

At trial, the government presented evidence of a complex international heroin trafficking scheme, stretching from Istanbul,

_____

[1] Bekar arrived in the United States on or about March 20, 1998.

Turkey, to San Francisco, California.  According to the government's evidence, several conspirators, including Bekar, entered into an agreement to import and distribute heroin within the United States. Three of the conspirators, Aziz Ghanbari (Ghanbari), Hakki Aksoy (Aksoy), and Hamid Reza Sayadi-Takhtehkar (Sayadi), negotiated to sell heroin to undercover agents from the DEA San Francisco field office, who were posing as wealthy Canadian business people interested in distributing heroin in North America.  These meetings took place in Vienna, Austria, New York, and San Francisco.  Additional conspirators were involved in transporting the heroin from Turkey to the United States, as well as concealing the heroin once it arrived here.  Hiding the heroin in the salt tanks of two water filtration systems, the conspirators delivered approximately 100 kilograms from Istanbul to Lubbock, Texas, where one of the conspirators, Mario Berger (Berger), an Austrian national, had a residence.  On November 14, 1995, Berger and another conspirator, Sezgin Yildizhan (Yildizhan), a citizen of the Netherlands, drove twenty-four kilograms of that heroin from Lubbock to New York, at which point Bekar entered the picture.

The government presented evidence that Bekar made two trips from London to New York in November and December, 1995.  Bekar first arrived in New York on November 24, 1995 and met with Yildizhan, who had been waiting in a hotel in Elizabeth, New Jersey.  After meeting with Yildizhan, Bekar was apparently unable to coordinate with the individuals to whom he intended to pass along the heroin.  He convinced

3

the owner of the Uskudar Turkish Restaurant (Uskudar restaurant) in Manhattan to allow him to leave a large suitcase containing the heroin at the restaurant for a period of time.[2] Bekar then returned to London. He made his second trip to New York on December 9, 1995. The purpose of this trip, according to the government, was to help coordinate the delivery of the heroin he had hidden at the Uskudar restaurant to the undercover DEA agents. Bekar left New York before any delivery actually took place.

The government also presented evidence that Bekar had been the target of a British Customs investigation, known as "Operation Fletcher," into a Turkish heroin operation in Britain. British Customs officers Mark Bishop (Officer Bishop) and Ian Goodman (Officer Goodman) testified and provided documentation and photographic evidence that Bekar had transferred large amounts of money to various accounts in Turkey through T.E.B. Travel, Ltd. (T.E.B.), a bureau d'change and travel agency in London.[3] Bishop testified that the manner in which

---

[2] The owner of the restaurant, Abdullah Ozdemir (Ozdemir), was not charged as a member of the conspiracy and does not appear to have known that the suitcase contained heroin. He testified at Bekar's trial that Bekar told him that the bag contained clothes and items relevant to Yildizhan's job as a shoe salesman.

[3] Officer Goodman testified that when he interviewed Bekar in May and September, 1997, after Bekar's arrest, Bekar told him that he had only visited the T.E.B. twice in his life and had never transferred money anywhere in the world except to Aksoy's lawyer in San Francisco. The evidence collected during Operation Fletcher demonstrated that Bekar had visited T.E.B. on at least thirty occasions and had transferred money to other countries on other occasions. It also showed that transactions through T.E.B. involving approximately £1.4 million were made on occasions between November, 1995, and July, 1996, when Bekar was photographed or observed at T.E.B.

4

Bekar disposed of certain sums in Janurary, 1996, including the exchange of £45,147 into 100,000 German marks and the transfer of the same amount to a receiver in Dubai, United Arab Emerites, was consistent with the money laundering activities of drug traffickers.[4] The British Customs officers also testified and provided documentation that Bekar associated with other known heroin traffickers.

The theory of Bekar's defense was that his gullibility and humanitarian impulses resulted in him being duped by the co-conspirators into helping them, albeit unwittingly. Bekar explained that Aksoy and his brother, Refat Aksoy (Refat), had befriended him and convinced him to help transfer funds through T.E.B. to the P.K.K., a Kurdish rebel movement in Turkey. While Bekar suspected that Aksoy and other co-conspirators were involved in heroin trafficking, he claimed that he sincerely believed he was only working with them in their efforts to help the Kurdish rebels. He claimed that his account at T.E.B. had been used without his knowledge to launder drug money, and that he had taken the two trips to New York with the purpose of assisting Aksoy and Rafat in legitimate business dealings, including the purchase of an automobile.

---

[4] Officer Bishop testified that drug traffickers often change bulky British Sterling currency (as well as Scottish pound notes) into foreign currency with higher denominations, such as German marks, Dutch guilders, or United States dollars, which can be transported more easily. Officer Bishop also testified that drug traffickers in Britain frequently launder drug money through Dubai because the United Arab Emerates is a "black hole" with no money laundering laws to speak of; the absence of such laws renders money impossible to trace once it has been transferred there.

On August 6, 1998, the jury convicted Bekar on both conspiracy counts. The district court conducted a sentencing hearing on November 19, 1998, and sentenced Bekar to two 400-month terms of imprisonment, to be served concurrently, followed by two five-year terms of supervised release, to begin upon his release.[5] Bekar timely appealed.

## Discussion

### I. Bekar's Conviction for Conspiracy to Import[6]

In his first point on appeal, Bekar contends that the government presented insufficient evidence to support his conviction for conspiracy

---

[5] Co-conspirators Aksoy, Burhanettin Saral, Hasan Saral, Senol Polat, Yildizhan, Sayadi, and Ghanbari were indicted with Bekar. Aksoy, Yildizhan, Sayadi, and Ghanbari, were convicted at separate trials. Ghanbari later died in custody. Berger pleaded guilty after his arrest on December 8, 1995. Burhanettin Saral, Hasan Saral, and Senol Polat remain fugitives.

[6] We note at the outset that Bekar's convictions for conspiracy to import, in violation of 21 U.S.C. § 963, and conspiracy to possess with intent to distribute and to distribute, in violation of 21 U.S.C. § 846, do not violate the Double Jeopardy Clause, even though they were based on the same single conspiracy. Ordinarily, an indictment runs afoul of the Double Jeopardy Clause when it alleges on its face two separate conspiracy counts under a single conspiracy statute based on one agreement. *See United States v. Olivares*, 786 F.2d 659, 664 (5th Cir. 1986) ("[E]ach conspiracy conviction must be supported by a corresponding separate agreement."); *United States v. Winship*, 724 F.2d 1116, 1126-27 (5th Cir. 1984). However, the Supreme Court has held that a single conspiracy may violate both § 963 and § 846 without raising Double Jeopardy concerns because the two conspiracy statutes "specify different ends as the proscribed object of the conspiracy–distribution as opposed to importation–and it is beyond peradventure that 'each provision requires proof of a fact [that] the other does not.'" *See Albernaz v. United States*, 101 S.Ct. 1137, 1142, 1145 & n.3 (1981) (quoting *Blockburger v. United States*, 52 S.Ct. 180, 182 (1932)). *Albernaz* controls this case and therefore Bekar has not been subjected to multiple punishments for the same offense in violation of the Double Jeopardy Clause.

6

to import heroin.[7]  Having reviewed the record and the briefs, and considered the argument of counsel, we do not agree.  We review the sufficiency of the evidence against Bekar to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 99 S.Ct. 2781, 2789 (1979).  We will view all evidence and reasonable inferences from the evidence in the light most favorable to the government.  *See United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir. 1997).

In order to establish guilt of conspiracy to import heroin, the government must prove beyond a reasonable doubt that (1) an agreement existed between two or more persons to import heroin, (2) that Bekar knew of the agreement, and (3) that he intentionally participated in the conspiracy.  *See United States v. Gourley*, 168 F.3d 165, 170 (5th Cir.), *cert. denied*, 120 S.Ct. 72 (1999); *United States v. Paul*, 142 F.3d 836, 839-40 (5th Cir. 1998).  A guilty verdict may be sustained "although the defendant engaged only in the conspiracy's distribution or delivery aspects after the contraband entered the country; importation is not complete until the drugs reach their final destination."  *Gourley*, 168 F.3d at 170 (citations omitted).  The government does not need to prove that Bekar knew all the details of the conspiracy, only that "he knew

_____

[7]  Bekar first moved for a judgment of acquittal at the close of the government's evidence, but did not renew the motion at the close of all evidence.  However, since he renewed it within seven days after the jury's verdict, under Rule 29(c), he has fully preserved his right of appellate review.  *See* FED. R. CRIM. P. 29(c); *United States v. Allison*, 616 F.2d 779, 784 (5th Cir. 1980).

7

of the conspiracy's essential purpose." *United States v. Osgood*, 794 F.2d 1087, 1094 (5th Cir. 1986).

While Bekar was not shown to have actively participated in importing the heroin into the United States from Turkey, or transporting it from Texas to New York, the government presented evidence that he facilitated its delivery once it arrived in New York. At trial, DEA agent Amir Hamidi (Agent Hamidi) testified that during negotiations with some of the conspirators in San Francisco on December 6, 1995, Aksoy and Ghanbari offered to sell the approximately twenty-five kilograms of heroin to the agents as a means of establishing trust between the two parties, and also as a promise of larger sales to come in the future.[8] Aksoy and Ghanbari told the agents that their "representative from London" would arrive in New York and oversee the delivery of the heroin. Aksoy also told Agent Hamidi that the heroin had been hidden in the United States and that his London associates were "still keeping" it.

As the government points out in its brief, evidence offered at trial demonstrated that Bekar was this representative from London. Yildizhan testified that once he arrived in New York in November, 1995, with the heroin, he contacted one of the principals of the conspiracy, Burhanettin Saral (Saral) in Turkey, asking for instructions. Saral told Yildizhan to wait and "a person from England" would arrive and

---

[8]     At trial, the government presented evidence that this approximately 25 kilograms of heroin was in fact the 24 kilograms that Berger and Yildizhan transported from Lubbock to New York, and that Bekar then concealed at the Uskudar restaurant.

8

relieve him of the drugs. Once Bekar arrived in New York, Saral told Yildizhan that a man named Halim Bekar was in New York to take the drugs from him. The government introduced records of a telephone call from Yildizhan's hotel in Elizabeth, New Jersey, to Bekar's hotel in New York. Yildizhan testified that Bekar met with him and attempted to contact the connections with whom he would deposit the heroin. Unsuccessful, Bekar bought a large suitcase to hide the heroin in, and arranged to leave the suitcase temporarily at the Uskudar restaurant. Bekar then left for London. At trial, Ozdemir, the owner of the restaurant, identified Bekar as the individual who asked him to store the suitcase temporarily at the restaurant.

Bekar returned to New York on December 9, 1995. Muzeyyen Ozdemir, wife of Ozdemir, identified Beker as the man who came to the restaurant on the evening of Sunday, December 10, and arranged for the suitcase to be picked up the next day. Undercover DEA agent Jon Goldberg (Agent Goldberg) testified that he had agreed with Aksoy and Ghanbari at a December 7 meeting in San Francisco that he would travel to New York within the next couple of days and meet with their London representative in order to facilitate the transfer of the heroin. Once in New York, he met with Sayadi and Ghanbari (who had also traveled to New York) and arranged for the pick-up of the heroin. Ghanbari told Agent Goldberg that the London representative had already left New York, but gave him the restaurant's address where the heroin had been left. Meanwhile Aksoy, still in San Francisco, spoke with Bekar and also gave Agent

9

Hamidi the restaurant's address. Ghanbari and Sayadi retrieved the heroin from the restaurant that afternoon, and were arrested with it soon afterwards.

Additional evidence linked Bekar to the conspiracy. The number of Bekar's mobile phone in London was written on the back of the business card that Ozdemir testified Bekar had given him; the same number was written on a piece of paper that Aksoy possessed at the time of his arrest; the number was also on a piece of paper poosessed by Yildizhan when he was arrested. Yildizhan testified that he had written the number in a "coded" fashion at Bekar's instruction. Telephone records reflected calls on December 10 and 11 from Ghanbari's and Sayadi's hotel to Bekar's hotel in New York, as well as calls from Aksoy's hotel in San Francisco to Bekar's London mobile phone number.

Based on this evidence, we find that the government presented a sufficient "development and collocation of circumstances" from which a reasonable jury could have inferred Bekar's knowing participation in the conspiracy. *See Osgood*, 794 F.2d at 1094 (citations and internal quotations omitted). "[W]e have consistently held that [a] jury may infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." *United States v. Gonzales*, 121 F.3d 928, 935 (5th Cir. 1997). Bekar's presence in New York during the orchestrated transfer of the heroin to the undercover agents, the testimony of Yildizhan about Bekar's arranging to pick up, conceal, and deliver the heroin, the identification of Bekar by both

10

Ozdemir and his wife as the man who secured the suitcase containing the heroin at the restaurant, and the evidence of phone calls between Bekar and the other conspirators, as well as the possession of his phone and hotel numbers by Ghanbari, Sayadi, Yildizhan, and Aksoy, all establish a basis upon which reasonable jurors could conclude that Bekar and these individuals had entered into an agreement sometime before Bekar arrived in New York "to act in concert to achieve the essential purpose of bringing drugs into the country." *Gourley*, 168 F.3d at 170; *see also United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998) ("[A] conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence.").[9]

This evidence also supports the jury's finding that Bekar knew of and participated in the agreement. For example, the record contains evidence that Bekar bought the suitcase and arranged for it to be stashed at the restaurant. There is also evidence that he provided the address of the restaurant to various co-conspirators, who in turn gave it to the undercover DEA agents. Yildizhan testified that Bekar knew exactly what the contents of the suitcase were, and even instructed him not to use the word "heroin" over the phone.[10] The evidence is more than

---

[9] Despite Bekar's suggestions to the contrary, we do not perceive in the record any evidence of distinct multiple conspiracies.

[10] The testimony of a single co-conspirator, even one who testifies on the basis of a plea bargain or promise of leniency, is sufficient to support a conspiracy conviction, as long as the testimony is not incredible as a mater of law. *See United States v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir.), *cert. denied*, 119 S.Ct. 182 (1998).

sufficient to justify the jury's inference of Bekar's knowledge of and voluntary participation in the conspiracy. *See Brito*, 136 F.3d at 410 (finding a defendant's ownership of and presence in a truck carrying drugs, as well as testimony of witnesses that defendant had participated in smuggling operation and had told one of them about another vehicle with a secret compartment, sufficient to support conspiracy conviction). Apparently, the jury found this evidence more compelling than Bekar's characterization of himself as a babe in the woods who had been duped by heroin traffickers masquerading as donors of humanitarian aid. As the finder of fact, the jury acted entirely within its rights to make this credibility determination.

## II. Evidentiary Challenges

Bekar objects to three evidentiary rulings made by the district court during the conduct of the trial, and contends that these erroneous decisions require reversal and a new trial. We will address them *seriatim*.

### A. Testimony of Officer Bishop

At trial, Officer Bishop testified that over the course of Operation Fletcher, British Customs agents had observed Bekar associating with an individual known as Sismek, who was later convicted of heroin trafficking. Bekar contends that the district court's admission of this testimony constitutes reversible error because it was irrelevant, unduly prejudicial, and demonstrated only guilt by association. This Court reviews a district court's evidentiary rulings

12

for abuse of discretion, unless the party challenging the ruling did not make a timely objection to the admission of the evidence, in which case we review for plain error.  *See United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998).

It is beyond question that the government may not establish guilt by showing that a defendant is related to or otherwise associates with "unsavory" persons.  *See United States v. Parada-Talamantes*, 32 F.3d 168, 170 (5th Cir. 1994) (quoting *United States v. Singleterry*, 646 F.2d 1014, 1018 (5th Cir. Unit A 1981)).  However, while Bekar objected to the testimony at the time it was elicited, there is some dispute whether Bekar's objection was proper.  Rule 103(a)(1) of the Federal Rules of Evidence requires that a finding of error in an evidentiary ruling must be based on a "timely objection or motion to strike [appearing in the] record, stating the specific ground of objection, if the specific ground was not apparent from the context."  FED. R. EVID. 103(a)(1); *Polasek*, 162 F.3d at 883.  Bekar objected to the testimony in question by stating, "Objection, your honor; relevance."  He did not elaborate further.

In *Polasek*, we noted that this Court has "not yet explicitly determined what statute or rule of evidence guilt by association evidence violates." *Id*. at 884 n.2.  We observed that other Courts of Appeals had found it either irrelevant, in violation of FED. R. EVID. 402, or unduly prejudicial, in violation of FED. R. EVID. 403 *See id.* The *Polasek* Court found that whether it was based on relevance or

13

prejudice, the defendant's objection to the evidence-"It doesn't prove that she had anything to do with [the crimes of her associates]"-sufficiently "put the court on notice" that she was objecting to guilt-by-association evidence. *See id.* at 883. Accordingly, the Court did not resolve the relevance-prejudice question and concluded instead that the evidence was irrelevant, and even if relevant, was unduly prejudicial. *See id.* Similarly, we decline to decide what basis, and with what degree of specificity, a defendant must articulate when objecting to guilt-by-association evidence. We will assume without deciding that Bekar's relevance objection sufficiently preserved his rights on appeal, and conclude that even if the district court's ruling was in error, the error, if any, was harmless.

The reason for our conclusion is fairly simple. In his opening statement, Bekar's counsel explained that Bekar associated-unknowingly, of course-with heroin traffickers, such as Rafat and Hakki Aksoy, who lured him into this scheme with stories about helping Kurdish rebels. Because Bekar already admitted that he associated with heroin traffickers, we do not discern what harm occurred by Officer Bishop testifying to essentially the same fact. Under Bekar's theory, Sismek could just as easily have been another trafficker out to dupe Bekar into furthering the criminal enterprise at issue here (or even a completely unrelated one). Accordingly, this complaint presents no basis for reversal.

B.  Testimony of Officer Goodman

14

Bekar next argues that the district court erred in admitting the testimony of Officer Goodman that British Customs agents had observed Bekar associating with two individuals known as Tremble and Fox, who were later charged with narcotics violations in Britain. As before, Bekar is contending that the government introduced prejudicial evidence that only showed guilt by association. This argument is even weaker than his argument about Officer Bishop's testimony: Bekar not only failed to object to the testimony about Tremble and Fox, but also it was his counsel that elicited it all during his cross-examination of Officer Goodman.

Under the "invited error" doctrine, "[a] defendant cannot complain on appeal of alleged errors invited or induced by himself." *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989). All the complained of evidence in this respect was adduced during Bekar's counsel's cross-examination of Officer Goodman. Of course, no objection was made below to any of this evidence. This Court can only reverse an invited error if it seriously jeopardized the substantial rights of the defendant. *See id.* Based on the significant evidence demonstrating Bekar's guilt, we find no reason to believe that this testimony either tipped the jury in favor of convicting Bekar or prejudiced the trial so seriously as to mandate reversal.

C.  Admission of Business Records and Testimony About T.E.B.

Finally, Bekar challenges the district court's decision to allow in business records from T.E.B. tending to show that Bekar engaged in

15

money laundering in Britain. He also objects to the testimony of Officer Bishop regarding the significance of these records. Bekar claims that the records and Officer Bishop's testimony were untrustworthy and therefore inadmissible under 18 U.S.C. § 3505, which governs the admission of foreign records; lacked sufficient indicia of reliability, as required by the Sixth Amendment; and failed to show Bekar's commission of extrinsic money laundering offenses under FED. R. EVID. 404(b), and were therefore irrelevant and unduly prejudicial. We review for abuse of discretion the district court's admission of evidence under Rule 404(b), *see United States v. Bermea*, 30 F.3d 1539, 1561 (5th Cir. 1994), as well as the admission of foreign records under 18 U.S.C. § 3505, *see United States v. Garcia Abrego*, 141 F.3d 142, 178 (5th Cir.), *cert. denied*, 119 S.Ct. 182 (1998). We review Bekar's constitutional challenge *de novo*. *See United States v. Guajardo*, 950 F.2d 203, 206 (5th Cir. 1991).

As discussed earlier, the theory of Bekar's defense was the he had been duped by Hakki and Refat Aksoy, among others, into making the two trips to New York and using his T.E.B. account to transfer money to the Kurdish rebels. In his opening statement, Bekar's counsel fully admitted that Bekar's T.E.B. account had in fact been used to launder drug money, albeit supposedly without Bekar's knowledge:

> "So in comes Mr. Bekar into the picture. And you will be able to see Refat's mind working as we talk about this during the trial. Here is an English citizen. He can do it, and the Turkish authorities don't have jurisdiction over him, and we can send all of this money, not only the money that the P.K.K. colleted from the heroin dealers, but, man, we have

16

got it made now.  We can launder our drug money through the T.E.B. and tell Mr. Bekar this is P.K.K. money and not drug money.'"

Before 1994, British law did not require identification to be presented at a bureau d'change before an individual could transfer or exchange money.  After the law was amended in 1994, anyone whose account with a bureau d'change had not been opened before the 1994 amendment had to present identification.  However, individuals like Bekar, who had accounts opened before the change took place, could still transact business without having to show identification. Officer Bishop testified that "anyone who arrived at T.E.B. with Mr. Bekar would be given access to his account."  It was part of Bekar's defense at trial that Aksoy and the other conspirators used him to take advantage of this loophole and transfer and/or exchange money through T.E.B. without showing identification.

We conclude that the district court neither abused its discretion nor violated the Sixth Amendment by admitting the T.E.B. records and permitting Officer Bishop to testify about them.  First, we reject Bekar's argument that the district court abused its discretion by admitting the records under section 3505.[11]  Bekar contends that while

---

[11]  18 U.S.C. § 3505(a)(1) provides in relevant part: "In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that–
    (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
    (B) such record was kept in the course of a regularly conducted business activity;

17

the statutory requirements of section 3505 were met, the circumstances surrounding the preparation of these documents "indicate lack of trustworthiness." 18 U.S.C. § 3505(a)(1). He argues that the records are unreliable because the director of T.E.B. "reluctantly" signed the certificates of authenticity, the British Customs agents could not link Bekar specifically to every use of the T.E.B. account, and "[t]he personnel at T.E.B. may well have had a motive to falsify records in the account or use the account for their own purposes" because T.E.B. was also the target of a British government investigation. None of these arguments is persuasive in the present context. As the government points out, certificates of authenticity were signed and the statutory requirements were met. Moreover, the reliability of the records was corroborated by observations by British Customs agents that Bekar entered T.E.B. on numerous occasions with large containers, presumably filled with cash, and that several transactions through his account involving large amounts of money occurred during his visits to T.E.B. Bekar's speculation about the motives of the T.E.B. personnel prove nothing. In sum, the district court did not abuse its discretion in determining that these records bear adequate indicia of reliability.

Second, because the records are reliable, their admission under

---

(C) the business activity made such a record as a regular practice; and
(D) if such record is not the original, such record is a duplicate of the original;
unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." 18 U.S.C. § 3505 (a)(1).

18

section 3505 did not violate Bekar's rights under the Sixth Amendment. *See Garcia Abrego*, 141 F.3d at 178 (citing *Ohio v. Roberts*, 100 S.Ct. 2531 (1980)).

Third, we do not believe that the district court abused its discretion in admitting the records as extraneous offenses under FED. R. EVID. 404(b).[12]   In order for extrinsic offense evidence to be admissible, it must be "relevant to an issue other than the defendant's character," and "must possess probative value that is not substantially outweighed by . . . undue prejudice." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978).  Extrinsic evidence is relevant only if the government offers some "proof demonstrating that the defendant committed the offense." *Id.* at 913.  However, the district court "need not be convinced beyond a reasonable doubt . . ., nor need [it] require the Government to come forward with clear and convincing proof." *Id.*

This Court has held that the entry of a not-guilty plea in a conspiracy case "raises the material issue of intent sufficiently to justify the admissibility of extrinsic offense evidence." *Bermea*, 30 F.3d at 1562; *see also United States v. White*, 972 F.2d 590, 599 (5th Cir. 1992) (finding that evidence of a defendant's previous money

---

[12]   FED. R. EVID. 404(b) provides in relevant part:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . . "

19

laundering activities relevant to drug conspiracy case in which the defendant pleaded not guilty). The government argues that it introduced the evidence that Bekar engaged in activity consistent with money laundering in order to establish Bekar's intent—an question Bekar placed directly at issue with his babe-in-the-woods defense—and that it provided sufficient proof that Bekar actually laundered drug money. Like the district court, we agree that the government presented sufficient evidence. British Customs collected evidence that Bekar made numerous visits to T.B.E.; that many of his visits coincided with transfers through his account of large sums of money, sometimes to known money laundering havens like Dubai; that he sometimes exchanged British Sterling for larger denomination foreign bills; and that some of the British currency he exchanged included low-denomination Scottish pound notes, which are a hallmark of drug money. Furthermore, we also believe that the extrinsic conduct was highly relevant to rebut Bekar's claim that he was an unwitting dupe. *See United States v. Nahoom*, 791 F.2d 841, 845 (11th Cir. 1986) (finding that evidence of defendant's money laundering activities relevant to determining whether defendant possessed requisite intent to engage in drug conspiracy).

The admission of these records and Officer Bishop's testimony about them did not substantially outweigh the evidence's probative value. As noted above, during opening statements, Bekar's lawyer introduced to the jury the fact that Bekar's T.E.B. account had been used, at least in part, to launder drug money, with or without Bekar's knowledge. The

20

business records demonstrated nothing more than that fact, and Officer Bishop's testimony amounted largely to the inferences he drew from his observations of Bekar and the matters related to the T.E.B. records. Accordingly, we find no abuse of discretion by the district court in allowing the government to present this evidence to the jury.

## Conclusion

Bekar's conviction is AFFIRMED.